654 A.2d 1365

JOHN J. ROBERTS, BOTH AS AN INDIVIDUAL AND AS GUARD-
IAN AD LITEM FOR THE MINOR PLAINTIFFS JAMES A.
ROBERTS AND SHERRY A. ROBERTS, PLAINTIFFS, v. RICH
FOODS, INC., A FOREIGN CORPORATION, WILLIAM LO-
VETTE, AND ANITA I. ROBERTS, DEFENDANTS.

ANITA I. ROBERTS, DEFENDANT AND THIRD–PARTY PLAIN-
TIFF–RESPONDENT, v. CADEC SYSTEMS, INC., A FOREIGN
CORPORATION, DEFENDANT AND THIRD–PARTY DEFEN-
DANT–APPELLANT, AND THE ESTATE OF ORLANDO SOLER,
THE ESTATE OF MARILYN MENKES, STONE AND WEBSTER
ENGINEERING CORPORATION, A MASSACHUSETTS CORPO-
RATION AUTHORIZED TO DO BUSINESS IN THE STATE OF
NEW JERSEY, CONDUIT AND FOUNDATION CORPORATION,
A PENNSYLVANIA CORPORATION AUTHORIZED TO DO
BUSINESS IN THE STATE OF NEW JERSEY, FLEET SAFETY,
A VIRGINIA CORPORATION, NEW JERSEY TURNPIKE AU-
THORITY, AND JOHN DOE 1–150, I/J/S/A, THIRD–PARTY DE-
FENDANTS.

Argued November 29, 1994—Decided March 21, 1995.

*Penny A. Bennett* argued the cause for appellant (*Smith, Stratton, Wise, Heber & Brennan*, attorneys; *Peter R. Freed*, of counsel; *Mr. Freed* and *Grayson Barber*, on the brief).

*Benjamin Goldstein* argued the cause for respondent (*Maressa, Goldstein, Birsner, Patterson, Drinkwater & Oddo*, attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the interpretation of the phrase "without impairing the usefulness of the product" as used in section 3a(2) of the New Jersey Products Liability Act of 1987 (the Act), *N.J.S.A.* 2A:58C–1 to –7. Section 3a(2) of the Act provides an absolute, affirmative defense for defendants in suits for design defect, if "the harm was caused by an unsafe aspect of the product that is an inherent characteristic of the product and that would be

recognized by the ordinary person who uses or consumes the product." Section 3a(2) also provides two exceptions that preclude use of the defense: when the product is "industrial machinery or other equipment [that] is used in the workplace"; and when the danger "can feasibly be eliminated without impairing the usefulness of the product." Only the second exception is before us.

## I

On August 27, 1987, a tractor-trailer truck owned by defendant Rich Foods, Inc., (Rich Foods), and operated by defendant William Lovette (Lovette) struck the car that Anita Roberts (Roberts) was driving. Several other cars were involved in the pile-up, and the accident resulted in fatalities and many injuries. Roberts was seriously hurt—she became a paraplegic—and her husband, John Roberts, and her minor children, who were sleeping passengers in the car, were also injured. Several hours after the accident, Lovette told the police that, as he had entered a construction area with a posted speed limit of forty-five miles per hour, he had been driving at sixty to sixty-five miles per hour and entering data in an "X–300" on-board computer manufactured by defendant Cadec Systems, Inc. (Cadec).

In September 1987, John Roberts, individually and as guardian *ad litem* for his two children, filed a complaint charging Rich Foods, Lovette, and his wife with negligence for causing the accident. In February 1988, Anita Roberts filed a cross-claim against Rich Foods and Lovette, and a third-party complaint against five additional parties involved in the accident. On August 25, 1989, plaintiffs and third-party plaintiff amended their pleadings to commence a product-liability action against Cadec for defectively designing, manufacturing, and labeling the computer. After a complicated series of claims and cross-claims among the many parties involved, the members of the Roberts family settled with Rich Foods and Lovette. All parties agreed that Lovette had been negligent; that Rich Foods, as his employer, was responsi-

ble; and that Lovette's negligence was a proximate cause of the accident.

The sole issue at trial was whether Cadec defectively designed the X–300 by allowing it to operate while a truck is in motion, which raises the risk that the driver's attention will be diverted from the road. The X–300 is Cadec's top of the line on-board computer. At issue is its "state/toll-road" function. Trucking companies are required to pay taxes based on fuel and road usage (mileage) in each state. The X–300's purpose is to provide a computerized record of that road-usage information for tax-reporting purposes.

At trial, Ernest J. Simmons., Jr., Cadec's former Chairman, President, Chief Executive Officer, and Treasurer, who was extensively involved in the designing of the X–300, testified that

> [t]he state/toll road feature is a button ... on the panel ... and upon depression of that button the on-board computer automatically records the odometer, the time ... and the day ... [T]hat recording together with information that is subsequently entered by the driver at some time thereafter, not necessarily coincident with the depression of the button, but at some time when it's safe to do so, that information is ultimately turned into a dispatch ... and processed on a central computer.... [The purpose of that information is] to gather road usage, or to gather data for tax reporting purposes ... [relating to] road use taxes for various states.

Simmons explained that the state/toll-road function is operable while a vehicle is in motion so that, when crossing state lines or entering or exiting toll roads, a driver can record data with greater precision.

At trial, the Robertses' counsel also read into evidence the deposition of Steven Frye, a Cadec program analyst. Frye, like Simmons, explained the purpose and operation of the state/toll-road feature. He noted that the entire data-recording procedure takes over ten seconds. If it is unsafe to enter information while in motion, the driver can do so at a later time, when the truck is stationary.

Cadec's Driver's Guide describes the initial entry of data using the state/toll-function as the one entry that automatically records the odometer reading, time, and date when the driver presses a

button on the computer. The Guide gives the following instructions:

1. Press the state/toll button to record the crossing of a state line, and when you enter or leave a toll road. The unit records the date, time and odometer reading when the button is pressed. *Record the following information when it is safe to do so.*

[ (Emphasis added.) ]

In a letter dated October 5, 1987, to the National Transportation Safety Board, the President of Cadec wrote that "a single button depression, similar to the button depression that changes a radio station on a car radio, determines the information that is displayed." The other entries can be recorded at a later time, "when it is safe to do so."

Cadec's Driver's Guide, however, does not indicate when it would be safe to record those other entries. According to Frye, Cadec expected each driver to exercise discretion about when it is safe to enter data. Frye admitted that it was technologically and economically feasible to make the X–300 operable only when a truck is stationary. According to Frye, Cadec's reason for making the computer operable while in motion was convenience to the driver in being able to enter data while driving away from a toll booth.

At the close of evidence, the Robertses moved for a directed verdict on the grounds that Cadec conceded that it could have designed the X–300 more safely by requiring the truck to be stationary when the driver enters information. The trial court denied the motion, finding that, because such a change would diminish the usefulness of the X–300, it would implicate the risk/utility analysis of the computer.

The trial court charged the jury that it was plaintiffs' burden to prove that the computer was defective because it was not reasonably safe for its intended or reasonably foreseeable use. To meet that burden, plaintiffs would have to prove that the computer's risks outweighed its utility. The trial court then instructed the jury to employ a risk/utility analysis for the purposes of determining whether the Cadec computer was defectively designed. Over

the Robertses' objection, the court went on to instruct the jury on the section 3a(2) defense, but not on that section's two statutory exceptions.

The jury found that the computer was not defective and returned a verdict of no cause of action. The trial court then denied the Robertses' motion for a new trial or, in the alternative, for a judgment n.o.v. Only Anita Roberts appealed, claiming that the charge on the section 3a(2) defense was reversible error because the two exceptions—workplace equipment and feasible elimination of the danger without impairing usefulness—made the defense unavailable to Cadec.

In an unpublished opinion, the Appellate Division reversed and remanded for a new trial. Because Cadec "acknowledged that it was technologically and economically feasible to have designed the computer to require the truck to be stationary in order to operate the computer," the Appellate Division held that "[t]he judge should not have charged this statute because it was undisputed that the dangers posed by this computer could have 'feasibly be[en] eliminated without impairing the usefulness of the product.'" (quoting *N.J.S.A.* 2A:58C–3a(2)).

The Appellate Division found "driver convenience" and "greater precision in recording" insufficient to justify the unsafe character of the X–300. The court held that, because the second statutory exception of section 3a(2) applied, the section 3a(2) defense was not available to Cadec. Therefore, the Appellate Division concluded that the trial court should have given an instruction on only risk/utility analysis, and not on the section 3a(2) defense. The Appellate Division remanded the case for a new trial on Roberts's third-party complaint against Cadec.

We granted Cadec's petition for certification, 137 *N.J.* 314, 645 *A.*2d 142 (1994).

## II

In construing a statute, "[t]he primary task for the Court is to 'effectuate the legislative intent in light of the language used and

the objects sought to be achieved.' " *Merin v. Maglaki,* 126 *N.J.* 430, 435, 599 *A.*2d 1256 (1992) (quoting *State v. Maguire,* 84 *N.J.* 508, 514, 423 *A.*2d 294 (1980) (footnote omitted)). In enacting the Act, the Legislature emphasized the importance of ascertaining its intent by providing in the Act itself that "such sponsors' or committee statements that may be adopted or included in the legislative history ... shall be consulted in the interpretation and construction of this act." *N.J.S.A.* 2A:58C–1a.

Hence, we approach our interpretation of section 3a(2) mindful of the Legislature's policy to limit the liability of manufacturers so as to " 'balance[ ] the interests of the public and the individual with a view towards economic reality.' " *Shackil v. Lederle Labs.,* 116 *N.J.* 155, 188, 561 *A.*2d 511 (1989) (quoting *Shackil v. Lederle Labs.,* 219 *N.J.Super.* 601, 643, 530 *A.*2d 1287 (1987) (Shebell, J.A.D., dissenting), *rev'd,* 116 *N.J.* 155, 561 *A.*2d 511 (1989)). *See also DePrimo v. Lehn & Fink Prods. Co.,* 223 *N.J.Super.* 265, 273, 538 *A.*2d 461 (Law Div.1987) (finding that in interpreting the Act, court should as "matter of sound judicial policy, ... apply this conservative legislative policy"). The Legislature

limit[ed] the expansion of products-liability law by creating absolute defenses and rebuttable presumptions of nonliability. *See N.J.S.A.* 2A:58C–3(a)(1) (adopting "state of the art" as complete defense in design defect claims); *N.J.S.A.* 2A:58C–3(a)(2) (providing that a product is not defectively designed if inherent characteristics of the product are known to ordinary person who uses it or consumes it with knowledge common to the class of persons for whom product was intended); *N.J.S.A.* 2A:58C–3(a)(3) (adopting comment k of the *Restatement (Second) of Torts,* which provides that a manufacturer or seller is not liable for a design defect if harm results from unavoidably unsafe aspect and product is accompanied by proper warning); *N.J.S.A.* 2A:58C–4 (establishing presumption of adequate warning if warning approved or prescribed by FDA).

[*Shackil, supra,* 116 *N.J.* at 187–88, 561 *A.*2d 511]

The Legislature passed the Act as "remedial legislation to establish clear rules [in] ... actions for damages for harm caused by products, including certain principles under which liability is imposed." *N.J.S.A.* 2A:58C–1. The law does not "codify all issues relating to product liability"; rather, the Legislature intended it to address "matters that require clarification." *Ibid.*

The Act left intact "the three theories under which a manufacturer or seller may be held strictly liable for harm caused by a product—defective manufacture, defective design, and defective warnings." *Dewey v. R.J. Reynolds Tobacco Co.*, 121 *N.J.* 69, 94–95, 577 *A.*2d 1239 (1990). *See N.J.S.A.* 2A:58C–2. The Act also provides that a claimant must "prove[ ] by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose." *N.J.S.A.* 2A:58C–2. Except as modified by sections 3 and 4 of the Act, the elements of the causes of action brought for such product claims "are to be determined according to the existing common law of the State." Senate Judiciary Comm., *Statement to Senate Bill No. 2805* (July 22, 1987), *reprinted in* note following section 1 (hereinafter "Senate Judiciary Committee Statement").

In attempting to limit a manufacturer's liability, the Legislature, via the Act, strengthened rather than weakened the state-of-the-art defense. William A. Dreier, *Analysis: 1987 Products Liability Act,* 41 *Rutgers L.R.* 1279, 1298 (1989). We note, however, that section 3b recognizes an exception to the 3a(1) state-of-the-art defense that is not applicable to this case. The section 3b exception applies to certain egregiously unsafe or ultrahazardous products that have hidden risks or could seriously injure third persons, and have little or no usefulness. State-of-the-art evidence is not a defense to liability for injury caused by such products. However, "[i]t is intended that such a finding would be made only in genuinely extraordinary cases—for example, in the case of a deadly toy marketed for use by young children, or of a product marketed for use in dangerous criminal activities." Senate Judiciary Committee Statement. What is clear is that "section 3(a)(1) now establishes a defense, subject only to the limited exceptions in section 3(b)." Dreier, *supra,* 41 *Rutgers L.R.* at 1298.

III

Section 3a(2) provides

a. In any product liability action against a manufacturer or seller for harm allegedly caused by a product that was designed in a defective manner, the manufacturer or seller shall not be liable if:

. . . .

■ The characteristics of the product are known to the ordinary consumer or user, and the harm was caused by an unsafe aspect of the product that is an inherent characteristic of the product and that would be recognized by the ordinary person who uses or consumes the product with the ordinary knowledge common to the class of persons for whom the product is intended, except that this paragraph shall not apply to industrial machinery or other equipment used in the workplace and it is not intended to apply to dangers posed by products such as machinery or equipment that can feasibly be eliminated without impairing the usefulness of the product. . . .

■ In construing a statute we first look at its plain language. *Merin, supra,* 126 *N.J.* at 434, 599 *A.*2d 1256. The Senate Judiciary Committee Statement notes that section 3a(2) adopts the "consumer expectations" test that we recognized in *O'Brien v. Muskin Corp.,* 94 *N.J.* 169, 463 *A.*2d 298 (1983) and *Suter v. San Angelo Foundry & Machine Co.,* 81 *N.J.* 150, 406 *A.*2d 140 (1979). However, examining the language of section 3a(2), we recognized in *Dewey, supra,* that the test is really a " 'hybrid' provision [that] combines the 'consumer expectations' doctrine for determining whether a product is defective with the obvious-danger factor of the risk-utility analysis to create a defense to a design-defect claim." 121 *N.J.* at 96, 577 *A.*2d 1239 (citations omitted).

■ Under pre-Act New Jersey case law, the risk/utility analysis determined whether or not a product was defectively designed—that is, whether its design was fit for its intended purpose. In *Cepeda v. Cumberland Engineering Co.,* 76 *N.J.* 152, 386 *A.*2d 816 (1978), *overruled in part by Suter, supra,* 81 *N.J.* 150, 406 *A.*2d 140, we listed the factors of that analysis:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

[*Id.* 76 *N.J.* at 174, 386 *A.*2d 816 (quoting John W. Wade, *On the Nature of Strict Tort Liability For Products*, 44 *Miss.L.J.* 825, 837–38 (1973)).]

Under *O'Brien, supra,* a product was defective, and unfit for its intended purpose, if its risks outweighed its utility: "In a design-defect case, the plaintiff bears the burden of both going forward with the evidence and of persuasion that the product contained a defect. To establish a *prima facie* case, the plaintiff should adduce sufficient evidence on the risk-utility factors to establish a defect." 94 *N.J.* at 185, 463 *A.*2d 298.

██ The Act, however, converted into absolute affirmative defenses what had been under the common law merely factors in the overall risk/utility analysis. *Dewey v. R.J. Reynolds,* 121 *N.J.* at 96 [577 *A.*2d 1239]. Specifically, it created as absolute defenses a state-of-the-art defense, *N.J.S.A.* 2A:58C–3a(1); an obvious-danger/consumer expectations defense, *N.J.S.A.* 2A:58C–3a(2); and an unavoidably unsafe defense, *N.J.S.A.* 2A:58C–3a(3).

[*Fabian v. Minster Mach. Co.,* 258 *N.J.Super.* 261, 271, 609 *A.*2d 487 (App.Div.), *certif. denied,* 130 *N.J.* 598, 617 *A.*2d 1220. (1992).]

By converting some factors of the risk/utility equation into absolute defenses, the Act "drastically changed the method of analyzing products-liability cases." *Dewey, supra,* 121 *N.J.* at 96, 577 *A.*2d 1239. Indeed, because "under [the Act], the consumer-expectations test cannot be avoided," *id.,* some commentators have referred to it as an element of the plaintiff's case:

[S]ince the Act so clearly provides that the test under section 3a(2) constitutes an *absolute defense to liability,* the net effect upon a plaintiff (suing on a claim in which consumer-expectations may be a component) requires that the section 3a(2) standard be included *within the proof of defect presented in the affirmative case.*

[William A. Dreier et al., *Products Liability and Toxic Tort Law in New Jersey: A Practitioner's Guide,* at 135.1 (6th ed. 1988 & Supp.1990) (emphasis added).]

Such an interpretation of 3a(2) accords with the fact that, under common law, the components of the 3a(2) defense were part of the

risk/utility analysis, and it was the plaintiff's burden to prove that risk outweighed utility. That burden remains on the plaintiff under section 2.

The Act, however, provides the defendant with a defense that did not exist under common law. Because consumer expectations and open-and-obvious danger were merely factors of the risk/utility test under common law, a plaintiff could still make out a case of design defect even if those factors weighed in favor of the defendant. Under the Act, that is no longer the case: a product that satisfies the 3a(2) standard is, by statutory definition, not defectively designed. If the harm caused by a product "would be recognized by the ordinary person who uses or consumes the product," and if the harm stems from an "inherent characteristic of the product," *N.J.S.A.* 2A:58C–3a(2), then the harm is not actionable. Because 3a(2) provides a new, absolute defense, the defendant should bear the burden of proving the 3a(2) defense by a preponderance of the evidence. "When an affirmative defense is raised [in a civil case], the defendant normally has the burden of proving it." Biunno, *Current N.J. Rules of Evidence*, comment 2 on *Evid.R.* 101(b)(1) (1994–95). However, because 3a(2) is an absolute defense that product-liability defendants will invariably raise, a plaintiff will rarely be able to go forward without addressing it.

The Act effected the same "conversion"—from mere factor to absolute defense—for the "state-of-the-art" test. *N.J.S.A.* 2A:58C–3a(1). For example, in reviewing a jury charge, the Appellate Division held that, "by including the state-of-the-art element only as an element of the risk/utility analysis, the court failed to give *defendant* the benefit of the absolute statutory affirmative defense available under *N.J.S.A.* 2A:58C–3a(1)." *Fabian, supra,* 258 *N.J.Super.* at 274, 609 *A.*2d 487. The same analysis applies to the section 3a(2) defense: if the defendant has proved it, and the plaintiff has not disproved it, the plaintiff will not recover.

■ The exceptions, however, provide two circumstances in which the 3a(2) absolute, affirmative defense is not available to the defendant: if the product is workplace equipment or if the danger can "feasibly be eliminated without impairing the usefulness of the product." *N.J.S.A.* 2A:58C–3a(2). Although case law and the legislative history are silent on whose ultimate burden it is to prove that the danger can or cannot feasibly be eliminated without impairing the usefulness of the product, we hold that the plaintiff bears that burden of proving that this exception precludes the defendant's use of the 3a(2) defense.

■ Placing on the plaintiff the burden of proving that the danger could feasibly be eliminated without impairing the product's usefulness conforms to both the plain language of the statute and legislative intent. The "without impairing the usefulness" element was a factor of the risk/utility analysis under common law. Just as section 3a(2) elevates some of those factors to an absolute defense that the defendant may raise, this exception to 3a(2) elevates a different factor to an exception that the plaintiff may raise. That the plaintiff will in most cases have to prove that the danger could be eliminated without impairing usefulness makes the plaintiff's task more difficult, and that was the intent of the Act. Hence, if a plaintiff proves by a preponderance of the evidence that the defendant could have eliminated the danger without impairing the usefulness of the product, then the product might be defectively designed even though the defendant has proved the 3a(2) defense.

## IV

The final question before us is, under section 3a(2), how severely must the elimination of danger impair the usefulness of the product? That is an issue of first impression. Moreover, even though the fourth factor of the common-law risk/utility analysis includes the "ability to eliminate the unsafe character of the product without impairing its usefulness," *Cepeda, supra,* 76 *N.J.*

at 174, 386 *A.*2d 816, no reported opinions have interpreted the phrase in that context.

Cadec asserts that removal of the danger posed by an allegedly defective product may impair its usefulness without rendering the product totally useless. Hence, Cadec seeks a standard under which the plaintiff has to prove that the danger can be eliminated without significantly diminishing the usefulness of the product. Under that standard, a plaintiff could not prevail by showing that the defendant could have designed a product that was safer, but significantly less useful.

[10, 11] The Act's legislative history suggests that "without impairing the usefulness" implicates the product's inherent characteristics and intended use. The Senate Judiciary Committee Statement refers to dangers "that can feasibly be eliminated without impairing the usefulness of the product, *because such dangers are not 'inherent.'*" (Emphasis added.) Hence, dangers that are not inherent can be eliminated without impairing usefulness. Conversely, dangers that are inherent cannot be eliminated without impairing usefulness. For example, the danger that a carving knife will cut the user cannot be eliminated because an exposed, sharp blade is an inherent characteristic of a carving knife, and essential to its intended use. A plaintiff could not establish the second exception to 3a(2) by proving that a dull knife would be safer. However, in the case of a lawn mower, the danger of being cut by sharp, exposed blades during use is not inherent: the manufacturer can include a cover that extends to the ground, so that the machine still cuts grass (its intended use) but does not pose nearly so great a threat of injury during operation. Thus, an inherent danger arises from an aspect of the product that is indispensable to its intended use. The danger of exposed, sharp blades is indispensable to knives, but not to lawn mowers.

Although no New Jersey cases have addressed the meaning of the phrase "without impairing the usefulness," a federal district court has predicted how this Court would eventually interpret the

phrase. In *McWilliams v. Yamaha Motor Corp., USA,* 780 *F.Supp.* 251 (D.N.J.1991), *modified,* 987 *F.*2d 200 (3d Cir.1993), the plaintiff, whose legs had been injured in a motorcycle accident, claimed .that the section 3a(2) defense was not available to the defendant motorcycle manufacturer because the defendant could feasibly have eliminated the danger of leg injury by adding crash bars. *Id.* at 253–54. Applying the Act, the district court held leg injuries to be an open and obvious danger of motorcycle riding that is inherent in the intended use of motorcycles and that, therefore, cannot feasibly be eliminated:

> In all likelihood, the New Jersey Supreme Court will rule that a motorcycle, a vehicle specifically designed as an open-air, easily maneuverable, light-weight vehicle, contains an open and obvious risk of lower-leg injury.
>
> ... [The plaintiff] would now have the court characterize *the intended use* of motorcycles as simply a means of transportation. Such a characterization, however, fails to consider the intended differences between a truck or an automobile and a motorcycle.... *To require a manufacturer to eliminate all the dangers associated with motorcycle accidents would require a manufacturer to deprive the motorcycle of its intended use* and turn the motorcycle into an enclosed vehicle. The risk associated with being in an accident while operating a motorcycle is just as open and obvious as the risk associated with using a knife which could slip and cut a finger.
>
> [*Id.* at 260 (emphasis added).]

The District Court granted the defendant manufacturer's motion for summary judgment. The Third Circuit found that summary judgment was inappropriate because there was a "material issue of fact as to whether the addition of crash bars would have eliminated the risk of lower leg injury ... without impairing the usefulness" of the motorcycle. *McWilliams, supra,* 987 *F.*2d at 206. However, the Court of Appeals focused on whether adding crash bars would eliminate the danger, *not* on whether adding crash bars would impair the usefulness of the motorcycle. *Id.* at 205–06. For that reason, the opinion of the Court of Appeals is not directly on point.

▮ Taking our lead from the legislative history's stress on the word "inherent," we hold that "impairing the usefulness of the product" means significantly diminishing its intended use. Even where it is economically and technologically feasible to eliminate

the danger, section 3a(2) still provides a defense if eliminating the danger would require eliminating an inherent characteristic.

Thus, a plaintiff seeking to establish the second exception to the 3a(2) defense must prove that the defendant could have eliminated the danger without eliminating an inherent characteristic of the product, and thereby significantly diminishing the product's intended use. We emphasize, however, that a feature of a product that is desirable but not necessary is not an inherent characteristic: an inherent characteristic is an essential characteristic. The elimination of an essential characteristic might not render the product totally useless, but it would measurably reduce the product's appropriateness for its central function. We make one final observation about jury evaluation of the second exception to the 3a(2) defense: juries will inevitably weigh the extent to which the elimination of the inherent danger would impair usefulness against the extent to which the change would improve a hazardous condition.

V

In the present case, Roberts bears the burden of proving "by a preponderance of the evidence that the [X–300] ... was not reasonably fit, suitable or safe for its intended purpose because it ... was designed in a defective manner." *N.J.S.A.* 2A:58C–2. Cadec bears the burden of proving the 3a(2) absolute defense: that the danger is open and obvious and that the harm was caused by an inherent and known characteristic of the product. Roberts then bears the burden of proving that, because Cadec could feasibly have eliminated the danger without impairing the X–300's usefulness, the 3a(2) defense is not available to Cadec.

Cadec argues that part of the intended use of the X–300 is to accept data entry while in motion. That would mean that operating while in motion is an inherent characteristic of the X–300, and that diverting the driver's eyes from the road is an inherent danger. Although Roberts discounts the reasons that Cadec's witnesses offered for making the computer operable while in

motion—convenience and precision—Cadec claims that those two characteristics are integral to the X–300.

Cadec admitted that it could have made the X–300 inoperable while in motion, but Roberts and the Appellate Division misapprehended that admission as a concession that Cadec could so design the computer without impairing its usefulness—a concession that the second exception to 3a(2) made the defense unavailable to Cadec. Even though it is technologically and economically feasible to redesign the product, it is not clear that that can be accomplished without impairing the usefulness of the X–300— without, that is, removing one of its inherent characteristics.

Because the state/toll-road function is operable while in motion, it poses the danger of diverting the driver's eyes away from the road. Although Cadec could have eliminated that danger, the question remains whether Cadec could have done so without significantly impairing the intended function of the onboard computer. Hence, a jury must decide whether operability of all functions while in motion is an inherent characteristic of the X–300, and whether or not eliminating that feature in whole or in part would significantly diminish its intended use.

The section 3a(2) defense itself applies if full operability while in motion is an inherent characteristic of the X–300. The danger of diverting ones eyes from the road is open and obvious to any driver, and hence "known to the ordinary consumer or user." The injury was caused (in part) by entering data while in motion, which may be an "inherent characteristic" of the computer that is "recognized by the ordinary [driver] who uses ... the product with the ordinary knowledge common to" drivers. *N.J.S.A.* 2A:58C–3a(2). Accordingly, the trial court correctly charged the risk/utility analysis and the section 3a(2) defense.

However, the trial court also should have charged the exception to the section 3a(2) defense. We do not agree with the trial court that the proofs were sufficient as a matter of law to establish that making the X–300 inoperable in whole or in part while in motion

would so impair the usefulness of the product that an instruction on the "impairing the usefulness" exception to the 3a(2) defense was unnecessary. Nor do we agree with the Appellate Division's conclusion that the record establishes that Cadec could feasibly have eliminated the dangers that the X–300 poses without impairing its usefulness. Instead, on this record, we find that whether Cadec could have—without impairing the usefulness of the computer—eliminated the dangers posed by the X–300's being operable while in motion is a question of fact that a jury properly charged should decide. For example, Cadec may prove that the initial, one-touch data entry cannot be made inoperable while in motion without impairing the usefulness of the X–300. The record is unclear, however, on whether Lovette was attempting to make the initial entry or the follow-up entries as he entered the construction area. Thus, Roberts may prove that Cadec could, without impairing the usefulness of the computer, feasibly have made only the ten-second follow-up procedure inoperable while in motion. All those considerations are properly for the jury to resolve.

As modified, the judgment of the Appellate Division is affirmed.

*For modification and affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—6.

*Opposed*—None.