690 A.2d 1100

COLLEEN THEOBALD, AS ADMINISTRATOR AD PROSEQUEN-
DUM FOR THE HEIRS AT LAW OF SEAN THEOBALD, DE-
CEASED AS ADMINISTRATOR OF THE ESTATE OF SEAN
THEOBALD, AND COLLEEN THEOBALD, HAROLD THEO-
BALD, INDIVIDUALLY, PLAINTIFFS–APPELLANTS, v. MI-
CHAEL DOLCIMASCOLA, AMY FLANAGAN AND ROBERT
BRUCK, DEFENDANTS–RESPONDENTS.

CHARLES HENN, JR., CHARLES HENN, JOAN HENN, KATH-
ERINE GRESSER AND JACKSON SPORTING GOODS, DEFEN-
DANTS–THIRD–PARTY PLAINTIFFS, v. CHRIS SMIDT,
THIRD–PARTY DEFENDANT.

Superior Court of New Jersey
Appellate Division

Submitted February 19, 1997—Decided April 2, 1997.

300

Before Judges DREIER, D'ANNUNZIO and NEWMAN.

*Mackevich, Burke & Stanicki,* attorneys for appellants (*James M. Burke,* on the brief).

*Mauro, Barry & Prindiville,* attorneys for respondent Michael Dolcimascola (*John C. Prindiville,* on the brief).

*Hoagland, Longo, Moran, Dunst & Doukas,* attorneys for respondent Amy Flanagan (*John C. Simons,* of counsel and on the brief).

*Zucker, Facher & Zucker,* attorneys for respondent Robert Bruck, Jr. (*James K. Haney,* on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

Plaintiffs, Colleen Theobald as Administrator Ad Prosequendum for the heirs of Sean Theobald and as administrator of his estate, and Colleen Theobald and Harold Theobald (the parents of the late Sean Theobald), individually, appeal from summary judgments dismissing their complaint against the three remaining

defendants, Michael Dolcimascola, Robert Bruck, and Amy Flanagan. Settlements or unappealed summary judgments have removed the remaining defendants from this case.

On January 20, 1991, plaintiffs' decedent, Sean Theobald, was in the second floor bedroom of his house with five of his friends. His father was downstairs watching television. The friends had gathered at 6:00 p.m. for a birthday party for one of the friends, Robert Bruck. The other teenagers present were Charles Henn, Michael Dolcimascola, Amy Flanagan and Katherine Gresser. At some time during the evening, the decedent produced an unloaded revolver and ammunition, both of which were examined by all of the teenagers. The discussion turned toward another friend of theirs who had died playing Russian Roulette, and the decedent indicated that he also would try the "game." According to the predominant version of the varying testimony, Sean put a bullet into the gun, pointed it at his head and pulled the trigger several times. He then put the gun down, checked the cylinder, and tried again three or four more times. The gun then went off, killing him. Other versions had the gun going off on the first occasion he tried, or the gun firing by accident without his putting the barrel to his head.[1] There was, however, ample testimony that there were several attempts made while the five other teenagers merely sat around and watched. The trial judge determined that if none of the teenagers actively participated, they had no duty to stop the decedent, and therefore summary judgment was entered.

*I*

The first question before us is whether any of the defendants, if they were mere observers to this tragic event, can be held civilly liable to plaintiffs. We are at a loss for a viable theory. Had this been a joint endeavor in which all were participating in the "game" of Russian Roulette, there is some authority that each

---

[1] We treat later an additional version in which Sean was in effect tricked into using a loaded gun, and the defendants knew of this.

of the participants in the enterprise might be held responsible, although the only cases we have been able to retrieve involve the criminal responsibility of participants. *See e.g., Commonwealth v. Atencio,* 345 *Mass.* 627, 189 *N.E.*2d 223, 224–26 (1963) (where the participants were found guilty of manslaughter). There is no reason to suppose that if the participants could be found criminally responsible, they could not also be held civilly liable. A line, however, has been drawn by the courts between being an active participant and merely being one who had instructed a decedent how to "play" Russian Roulette. In the latter case, a defendant was determined to be free of any potential criminal liability. *Lewis v. State,* 474 *So.*2d 766, 771 (Ala.Crim.App.1985). Another court, *in dictum,* stated that inducing an individual to engage in Russian Roulette creates a sufficiently foreseeable harm to engender potential civil liability. *Great Central Ins. Co. v. Tobias,* No. 86 AP–820, 1987 WL 9624, at *5 (Ohio.Ct.App.1987).

The most comprehensive New Jersey statement of the existence of a duty to another was expressed in *Wytupeck v. City of Camden,* 25 *N.J.* 450, 136 *A.*2d 887 (1957). Although the case involved the question of liability for the use of a dangerous instrumentality on defendant's land, the case explored when a duty to act arises in inter-personal relationships:

"Duty" is not an abstract conception; and the standard of conduct is not an absolute. Duty arises out of a relation between the particular parties that in right[,] reason and essential justice enjoins the protection of the one by the other against what the law by common consent deems an unreasonable risk of harm, such as is reasonably foreseeable. In the field of negligence, duty signifies conformance "to the legal standard of reasonable conduct in the light of the apparent risk;" the essential question is whether "the plaintiff's interests are entitled to legal protection against the defendant's conduct." *Prosser on Torts,* (2d ed., section 36). Duty is largely grounded in the natural responsibilities of social living and human relations, such as have the recognition of reasonable men; and fulfillment is had by a correlative standard of conduct.

[*Id.* at 461–62, 136 *A.*2d 887 (some citations omitted).]

If defendants had either been participants or had induced decedent to play Russian Roulette, or even if there had been some other factor by which we could find a common enterprise, then defendants may have had a duty to act to protect Sean from the

consequences of his foolhardy actions. Such a duty would never-theless invoke the usual principles of comparative negligence. *Cf. Yount v. Johnson,* 121 *N.M.* 585, 915 *P.*2d 341, 342–43 (App.1996) (addressing the term "duty"). The problem with such potential liability, however, is the significant factor of a decedent's own negligence which, when measured against any participant's breach of a duty of care, would probably preclude recovery in most cases.

What we are left with in the case before us, positing that there was no proof of encouragement or participation, is a claim which is grounded in a common law duty to rescue. As has been explained in texts and reiterated in case law, there is no such duty, except if the law imposes it based upon some special relationship between the parties. *See* W. Page Keeton, et al., *Prosser and Keaton on Torts,* § 56, at 375 (5th ed. 1984) ("[T]he law has persistently refused to impose on a stranger the moral obligation of common humanity to go to the aid of another human being who is in danger, even if the other is in danger of losing his life."); J.D. Lee and Barry A. Lindahl, *Modern Tort Law,* § 3.07, at 36 (1994 and Supp.1996) ("With regard to rescues, it has been stated that the general rule is that there is no liability for one who stands idly by and fails to rescue a stranger...."); *Restatement (Second) of Torts,* § 314 (1965) ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."). The Restatement's Illustration 1 is instructive. It posits the actor, A, viewing a blind man, B, stepping into the street in the path of an approaching automobile, where a word or touch by A would prevent the anticipated harm. The Restatement concludes that "A is under no duty to prevent B from stepping into the street, and is not liable to B."

Recent New Jersey decisions have focused upon the exceptions to this general rule and involve situations where a duty to act exists as a result of the relationship between the parties, namely, police-arrestee (*Del Tufo v. Township of Old Bridge,* 147 *N.J.* 90, 685 *A.*2d 1267 (1996); *Hake v. Manchester Township,* 98 *N.J.* 302,

486 *A*.2d 836 (1985)) and physician-patient (*Olah v. Slobodian,* 119 *N.J.* 119, 574 *A*.2d 411 (1990)). These cases also address the liability of a ship's captain for failing to attempt to rescue a drowning seaman.

All of these cases are distinguishable from the situation before us, assuming the five observers were mere bystanders upon whom the law places no duty to have protected the decedent. While we may deplore their inaction, we, as did the trial judge, find no legal authority to impose liability. We note the ease with which defendants could have reached out and taken away the revolver when Sean put it down between his two series of attempted firings, or the simple act of one of the five walking to the door and summoning Sean's father, or even remonstrating with Sean concerning his actions. But such acts would have been no more or less than the simple preventatives given in the Restatement Illustration of a word or touch necessary to save a blind pedestrian. Where there is no duty, there is no liability.

We recognize that the Supreme Court in *Wytupeck v. City of Camden, supra,* has defined duty as a flexible concept:

"Duty" is not a rigid formalism according to the standards of a simpler society, immune to the equally compelling needs of the present order; duty must of necessity adjust to the changing social relations and exigencies and man's relation to his fellows; and accordingly the standard of conduct is care commensurate with the reasonably foreseeable danger, such as would be reasonable in the light of the recognizable risk, for negligence is essentially "a matter of risk * * * that is to say of recognizable danger of injury."

[*Wytupeck v. City of Camden, supra,* 25 *N.J.* at 462, 136 *A*.2d 887 (citation omitted).]

But, if a legally actionable duty is to be found in a situation such as the one before us, it must be declared by the Supreme Court.

## II

We now pass to a separate issue in the case, whether the trial judge correctly excluded a statement by another friend of the teenagers', Chris Smidt, a boyfriend of the decedent's sister and a licensed private detective. He asserted that on the night of the incident he spoke at the hospital with Flanagan and Gresser. According to Smidt in his 1995 deposition, the two girls told him

that "Sean had left the room and they were passing the gun around or Sean left the room and the young man Michael [Dolcimascola] had put a round in the weapon and Sean had no knowledge of it." He further acknowledged in his deposition that the girls later changed their story. In an earlier statement, given in 1993, Smidt stated in paragraph twelve:

> Shortly after Sean's funeral, Amy Flanagan told me that they were all up in Sean's room. Amy told me that when Sean left the room, Mike Dolcimascola[ ] took a bullet and put it in the gun, and that no one told Sean when he returned that there was a bullet in the gun.

Both Flanagan and Gresser have stated in depositions that they never made such a statement to Smidt and that the incident allegedly described by them did not happen. The trial judge ruled that Smidt's statements were hearsay and could not be admitted against any of the defendants.

This ruling was incorrect, at least as to defendants Flanagan and Gresser, although Gresser is no longer a party defendant. The statements allegedly made to Smidt were clearly admissible against Flanagan under *N.J.R.E.* 803(b)(1) as a statement of a party-opponent.

■ There is even a question whether the statements were excited utterances or were otherwise admissible under another hearsay exception. If so, they would thus be admissible against the other defendants. For example, if the excited utterance exception were to apply, the statements certainly related to a startling event or condition. The only issue would be whether, when the young women allegedly made the statements at the hospital, they were still "under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." They had just witnessed a friend shooting himself and had gone to the hospital where they encountered Smidt.

If, after a hearing pursuant to *N.J.R.E.* 104(a), the alleged statements are found to be excited utterances or otherwise generally admissible, they then could also be admissible against defendants Bruck and Dolcimascola. A problem is that this appears to be the only potential evidence against the young men. The judge,

therefore, should now hold a *N.J.R.E.* 104(a) hearing and make a determination whether these alleged statements are generally admissible, rather than admissible on a limited basis only against Flanagan. At that time, the court also should attempt to define the precise nature of the alleged statements and the certainty of Smidt's recollection. There then may be a basis for the renewal of the summary judgment motions, applying the standard of *Brill v. Guardian Life Insurance Co. of America*, 142 *N.J.* 520, 666 *A.*2d 146 (1995).

In sum, we determine that there was no common law duty owed by defendants to the decedent if defendants were mere observers of his shooting. If, however, there is admissible evidence against one or more of the defendants that they participated in deceiving the decedent into assuming the weapon was not loaded when in fact one of them had placed a bullet in the cylinder, then liability may be imposed against such defendant or defendants for such conduct. As to this last issue only, the summary judgment is reversed and the matter is remanded to the Law Division for further proceedings. In all other respects, the summary judgment is affirmed. We do not retain jurisdiction.