Katherine E. LESLIE, as Administratrix and Administratrix ad Prosequendum of the Estate of Robert S. Leslie, et al., Plaintiffs,

v.

UNITED STATES of America, Christopher Green, Olin Corporation and the Sports Authority, Defendants.

No. CIV. A. 96–5558.

United States District Court, D. New Jersey.

Dec. 3, 1997.

William C. Sandelands, Podvey, Sachs, Meanor, et al., Newark, NJ, for Plaintiffs.

Brenda M. Green, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, Daniel P. Jaffe, Jeanine R. Bermel, David L. Schenberg, Husch & Eppenberger, St. Louis, MO, Stanley P. Fishman, Fishman & Callahan, East Hanover, NJ, for Defendants.

## OPINION

LIFLAND, District Judge.

Presently before the Court are motions by the United States of America to dismiss plaintiffs' complaint for lack of subject matter jurisdiction pursuant to *Fed.R.Civ.P.* 12(b)(1), and by Olin Corporation and the Sports Authority to dismiss plaintiffs' complaint for failure to state a claim upon which relief may be granted pursuant to *Fed. R.Civ.P.* 12(b)(6). For the reasons set forth herein, defendants' motions are granted in their entirety.

## BACKGROUND

On November 25, 1996, plaintiffs, Katherine E. Leslie, as Administratrix and Administratrix ad Prosequendum of the Estate of Robert S. Leslie, Erika Lomaga, Executrix of the Estate of George P. Lomaga, David Grossman and Karen Abarbanel and Cathy Ann Walensky, Administratrix and Administratrix ad Prosequendum of the Estate of Stanley (Scott) Walensky, Cathy Ann Walensky, individually and as Guardian ad Litem for Eric Walensky, Sherrie Walensky and Susan Walensky (hereinafter collectively the "plaintiffs"), each filed suit against defendants, the United States of America, Christopher Green (hereinafter "Green"), Olin Corporation (hereinafter "Olin") and the Sports Authority (hereinafter collectively the "defendants"). By orders dated April 9, 1997 and August 28, 1997, the Court consolidated plaintiffs cases.[1] Plaintiffs' complaint alleges the following.

At approximately 4 p.m. on March 21, 1995, Green went to the Montclair Post Office, located in Montclair, New Jersey, with the express purpose and intent to rob the post office and to murder any witness therein. At the time, plaintiffs' decedents were present at the post office, which was operated by the United States Postal Service, an agency of the United States. The United States did not provide security for its postal customers, despite the large amounts of cash, stamps, money orders and other valuable items exchanged there. Green was aware of this lack of security and targeted the post office for that reason. During the course of the robbery, and in order to eliminate witnesses, Green shot and killed Robert Leslie, George Lomaga and Scott Walensky, and seriously injured David Grossman (hereinafter collectively the "victims"). Green shot his victims using a semi-automatic handgun loaded with Winchester Black Talon bullets, which were manufactured by Olin. Green purchased the bullets on November 24, 1995 from the Sports Authority located in Wayne, New Jersey, two days after Olin issued a press release stating it was withdrawing Black Talon bullets from sale to the general public.

In Counts I and II, plaintiffs allege that the United States was negligent in its failure to provide security and to safeguard its postal customers during a robbery which it knew, or should have known, was likely to occur given the amount of cash and other items of value on hand and the absence of security. Plaintiffs allege that as a direct and proximate cause of such negligence, the victims were caused to suffer great pain and anguish, and severe and multiple bodily injuries resulting in death.

In Count V,[2] plaintiffs allege that Olin manufactured, advertised, distributed and sold Winchester Black Talon bullets which were "defectively designed in such a manner as to open into razor sharp edges and to severely rip through and mutilate body parts of the individual shot by such bullets." Leslie Complaint, at ¶ 20. Plaintiffs allege that the bullets were defective, unreasonably dangerous, unfit and unsuitable for the purposes for which they were intended. Plaintiffs allege that the defectively designed bullets were the proximate cause of the victims' deaths and that Olin is thus strictly liable in tort.

---

1. Given the consolidation of plaintiffs' cases, all references herein shall be made to plaintiffs' complaint in the singular, and all citations shall be to the complaint filed in the lead case, *Leslie v. United States* (hereinafter the "Leslie Complaint").

2. Counts III and IV address Green's alleged liability. In those counts, plaintiffs allege that as a direct and proximate result of Green's intentional acts, the victims were caused to suffer severe and multiple bodily injuries resulting in death.

In Count VI, plaintiffs allege that the Black Talon bullets manufactured by Olin are egregiously unsafe or ultrahazardous and, as such, pose a risk of serious injury to persons other than the user or consumer, and have little or no usefulness. Plaintiffs allege that the ultrahazardous nature of the bullets caused the victims' deaths.

In Count VII, plaintiffs allege that at the time of Green's purchase of the bullets from the Sports Authority, the Sports Authority knew or should have known of the defect in the bullets because Olin had already withdrawn the bullets from sale to the general public. Plaintiffs allege that the Sports Authority is strictly liable in tort by reason of its sale of the defective bullets which proximately caused the victims' deaths.

Count VIII alleges that Olin negligently marketed Black Talon bullets by deliberately packaging and marketing the bullets to the public as "ammunition which rips, cuts and destroys organs, tissue and bones in the human body in the same manner as the ripping and cutting action of the talons on a bird." Leslie Complaint, at ¶ 30. Plaintiffs allege that Olin knew or should have known that the advertisements would attract criminals, and that Olin's negligent marketing of the bullets was the proximate cause of the victims' deaths.

Count IX alleges that Olin negligently failed to recall Black Talon bullets from sale to the general public after Olin knew or had reason to know of the dangerous and defective nature of the bullets, the use of which proximately caused the victims' deaths.

Count X alleges that the Sports Authority negligently sold the bullets to Green after Olin recalled the bullets from sale to the general public. Plaintiffs allege that the Sports Authority's negligence proximately caused the victims' deaths.[3]

### The Instant Motions

On May 29 and 30, 1997, the United States and Olin, respectively, filed motions to dismiss plaintiffs' action for lack of subject matter jurisdiction pursuant to *Fed.R.Civ.P.*

12(b)(1), and for failure to state a claim pursuant to *Fed.R.Civ.P.* 12(b)(6). On June 2, 1997, the Sports Authority joined in Olin's motion.[4] The United States argues that plaintiffs' claims must be dismissed because the discretionary function exception to the federal Tort Claims Act deprives this Court of subject matter jurisdiction. The United States argues that claims regarding the nature and extent of security at Postal Service facilities are grounded in policy and as such fall within the discretionary function exception to the Federal Tort Claims Act.

Olin argues that plaintiffs' complaint fails to state any cause of action against Olin or the Sports Authority. First, Olin contends that plaintiffs fail to state a claim for strict products liability under New Jersey law because plaintiffs have failed to state facts establishing that Black Talon bullets are defectively designed within the meaning of N.J. Stat. Ann. 2A:58C–2. Olin argues that because the bullets functioned exactly as intended, are inherently dangerous and such danger is obvious to the product's user, Olin falls within the scope of the "obvious danger/consumer expectation" defense. Olin also maintains that because Black Talon bullets are incapable of being made safe for their intended use, Olin falls within the scope of the "unavoidably unsafe" defense.

Olin further argues that plaintiffs' complaint fails to state any cognizable negligence claim against Olin or the Sports Authority. Olin argues that New Jersey law does not recognize a cause of action for either negligent marketing or negligent failure to recall. Olin argues that New Jersey law does not support the imposition of a duty on Olin to protect against criminal misuse of its legally sold product or to refrain from advertising the characteristics of its ammunition. Olin also argues that New Jersey courts will not impose a post-sale duty on a manufacturer of a non-defective product. Olin further contends that Green's intentional shooting, not defendant's marketing or the bullets, was the

---

3. Count XI seeks damages for the victims' pain and suffering caused by the alleged torts of Olin and the Sports Authority.

4. The Sports Authority has also joined in Olin's briefs and has not submitted separate briefs.

independent and proximate cause of the victims' injuries.

## STANDARD OF REVIEW

■ A motion to dismiss for lack of subject matter jurisdiction attacks the facial validity of the complaint and is ordinarily analyzed pursuant to *Fed.R.Civ.P.* 12(b)(1). *See Fed.R.Civ.P.* 12(b)(1); *Attallah v. United States,* 955 F.2d 776, 782 (1st Cir.1992) (holding that court lacks subject matter jurisdiction over cases which fall within discretionary function exception to Federal Tort Claims Act). However, where resolution of the jurisdictional question is intertwined with the merits of the action, a court is required to treat the motion as one for dismissal pursuant to *Fed.R.Civ.P.* 12(b)(6), or as one for summary judgment pursuant to *Fed.R.Civ.P.* 56. *Holt v. United States,* 46 F.3d 1000, 1003 (10th Cir.1995). The jurisdictional question is intertwined with the merits of the action where the court's subject matter jurisdiction depends upon the same statute which governs the substantive claims in the case. *Id.*

A motion to dismiss pursuant to *Fed. R.Civ.P.* 12(b)(6) serves to test the sufficiency of the complaint. *See Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). In considering such a motion, a court must accept the allegations of the complaint as true. *See Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). A court should not dismiss a complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). While a court must assume the alleged facts are true, it is not proper to assume that a plaintiff can prove facts not alleged. *Bishop v. Okidata, Inc.,* 864 F.Supp. 416, 420 (D.N.J.1994). A court may, however, consider undisputedly authentic documents attached to the motion papers of either party. *Id.* at 424 n. 10.

## DISCUSSION

### The United States' Motion to Dismiss

Plaintiffs' claims against the United States are predicated upon the Federal Tort Claims Act (hereinafter the "FTCA"). Because the United States contends that a provision of the FTCA deprives this Court of jurisdiction, the jurisdictional question is intertwined with the merits of plaintiffs' case. Accordingly, the Court will treat the United States' motion as a motion to dismiss pursuant to *Fed. R.Civ.P.* 12(b)(6).

■ The FTCA waives the sovereign immunity of the federal government with respect to tort claims seeking money damages. *See* 28 U.S.C. § 1346(b). The discretionary function exception to the FTCA acts as a limitation on that waiver by preserving the United States' immunity against claims based upon the exercise of discretionary functions. *See* 28 U.S.C. § 2680(a). Section 2680(a) provides in pertinent part:

> The provisions of section 1346(b) of this title shall not apply to—
>
> (a) Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* In order for the discretionary function exception to apply, a court must find that: (1) the decision or action in question is a matter of judgment or choice for the acting employee and (2) the judgment involved is based on considerations of public policy and as such is the kind that the discretionary function exception was intended to shield from liability. *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991); *Berkovitz by Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988); *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984); *Fisher Bros. Sales, Inc. v. United States,* 46 F.3d 279, 284 (3d Cir.1995). Because the purpose of the exception is to " 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort,' when properly construed, the exception 'protects only government actions and decisions based on considerations of public policy.' " *Gaubert,*

499 U.S. at 323, 111 S.Ct. at 1273–74 (quoting *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. at 2765; *Berkovitz,* 486 U.S. at 537, 108 S.Ct. at 1959).

■ Under the first prong of the analysis, the pertinent inquiry is whether the controlling statute or regulation prescribes that a government agent perform in a specific manner, or instead commits performance decisions to the judgment of the agency or official. *Id.* 499 U.S. at 328, 111 S.Ct. at 1276; *see Hughes v. United States,* 110 F.3d 765, 768 (11th Cir.1997). Discretionary acts are not limited to decisions at the policy making or planning levels. *Gaubert,* 499 U.S. at 323, 111 S.Ct. at 1273–74. Discretionary acts may also include day-to-day management or operational duties which require the exercise of choice or judgment. *Id.; see United States Fidelity & Guaranty Co. v. United States,* 837 F.2d 116, 121 (3d Cir.), *cert. denied,* 487 U.S. 1235, 108 S.Ct. 2902, 101 L.Ed.2d 935 (1988).

The focus of the court's inquiry should not be the agent's rank or his subjective intent in exercising the discretion conferred by statute or regulation. *Id.* Nor need the court examine the record for evidence of a conscious policy decision. *Sea–Land Serv., Inc. v. United States,* 919 F.2d 888, 892 (3d Cir. 1990). Rather, in determining whether the challenged action involves the permissible exercise of policy judgment, the court must look to the nature of the decision and whether it is a matter "susceptible to policy analysis." *Gaubert,* 499 U.S. at 325, 111 S.Ct. at 1275; *Sea–Land,* 919 F.2d at 892 (holding that decision to operate asbestos-containing ships presented significant question of resource allocation and was therefore "susceptible to policy analysis"); *United States Fidelity & Guaranty Co.,* 837 F.2d at 121 ("[I]t is irrelevant whether the government employee actually balanced economic, social, and political concerns in reaching his or her decision ... ' [t]he test is not whether the government actually considered each possible alternative in the universe of options, but whether the conduct was of the type associated with the exercise of official discretion."). "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert,* 499 U.S. at 324, 111 S.Ct. at 1274.

For a complaint to survive a motion to dismiss based on the discretionary function exception, it must allege facts which support a finding that the challenged conduct is not grounded in the policy of the relevant statutory or regulatory scheme. *Gaubert,* 499 U.S. at 324–25, 111 S.Ct. at 1274–75. Thus, for plaintiffs to prevail in the instant case, they must allege facts to establish that the decision not to provide security at the Montclair Post Office was not grounded in the policies of the federal regulations governing the United States Postal Service.

The United States Postal Service was created to "provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people." 39 U.S.C. § 101(a); *Hughes,* 110 F.3d at 768. To achieve that aim, Congress has ordained that the Postal Service "shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities." 39 U.S.C. § 101(a); *Hughes,* 110 F.3d at 768. Accordingly, Congress has granted the Postal Service the authority to operate and maintain postal facilities. 39 U.S.C. § 401(6). Federal regulations promulgated under this authority designate the Chief Postal Inspector as the Security Officer for the Postal Service and make him "responsible for the issuance of instructions and regulations pertaining to security requirements within the Postal Service." 39 C.F.R. § 231.1(b); *Hughes,* 110 F.3d at 768. The postmaster or designated supervisor acts as the Security Control Officer for each individual post office, and as such is "responsible for the general security of the post office, its stations and branches in accordance with rules and regulations issued by the Chief Postal Inspector." 39 C.F.R. § 231.2; *Hughes,* 110 F.3d at 768; *Ramirez v. United States Postal Service,* 893 F.Supp. 121, 124 (D.P.R.1995).

■ Turning to the first prong of the discretionary function analysis, it is readily ap-

parent that the federal guidelines governing security at postal facilities do not mandate a specific course of conduct for the Chief Postal Inspector or the Security Control Officers of each post office. Rather, the guidelines allow for an exercise of judgment or choice by committing security decisions to the discretion of the Security Control Officer in accordance with regulations issued by the Chief Postal Inspector. Plaintiffs argue that because no decision to provide, or not to provide, security was ever made, the United States did not exercise any discretion and therefore cannot invoke the discretionary function exception. The Court is unpersuaded by plaintiffs' semantics. The governing federal regulations clearly commit the implementation of security procedures, if any, to the Chief Postal Inspector and the individual postmasters. That the Montclair Postmaster opted not to implement any procedures does not remove his authority to do so from the reach of the exception. Plaintiffs have not cited, and this Court's research has not yielded, any statutes, regulations, or policies which require implementation of specific security measures by each Security Control Officer. Accordingly, the first part of the discretionary function exception is satisfied. *See Ramirez,* 893 F.Supp. at 124.

The second prong of the analysis requires the Court to consider whether the judgment afforded the Montclair Postmaster is of a kind the discretionary function was intended to protect from liability, i.e., whether the decision of the Montclair Postmaster not to provide security and to rely on local law enforcement is "susceptible to policy analysis." *Gaubert,* 499 U.S. at 325, 111 S.Ct. at 1275; *Hughes,* 110 F.3d at 768. The United States contends, and plaintiffs do not dispute, that the decision to rely solely on local law enforcement was based on its limited financial resources and the absence of any history of criminal activity at the Montclair Post Office. Because decisions involving security at postal facilities involve allocation of often limited resources, they are integral to the social and economic policy analyses required to attain the Congressional goals of prompt, reliable and efficient mail service to all people in all communities. *See Hughes,* 110 F.3d at 768–69. Under *Gaubert,* the Court

need not inquire whether the Montclair Postmaster or any postal employee balanced economic, social, and political concerns in opting not to implement security measures. This Court must presume that the determination of the Montclair Postmaster was grounded in policy when he exercised the permissible discretion. Accordingly, the Court declines to second-guess the United States' resource allocation decision here.

The Court further rejects plaintiffs' argument that "it is not the decision to rely on the local police that is at issue, it is the Postal Service's negligence in the operational aspect of that decision that is at issue." Plaintiffs' Joint Brief in Opposition to United States of America's Motion to Dismiss, at 9. Plaintiffs argue that had Montclair postal employees alerted the police that the robbery was in progress, Green's crime could have been interrupted and lives could have been saved. In support of this contention plaintiffs cite *Chachere v. United States,* 1990 WL 120618 (E.D.La. Aug.14, 1990). In *Chachere,* the court was not faced with a postmaster's nonimplementation of security measures, but rather with questions concerning the effectiveness of security measures which had already been implemented by the post office. *Id.* at * 2 ("[Plaintiff] alleges that she was injured because the government-employed security guards were 'goofing off,' ill-trained, incompetent, or simply not doing what they were hired by defendant to do."). The court declined to dismiss plaintiff's complaint, holding that while a decision involving the implementation of security would constitute a discretionary function, once the United States undertook to provide security it was held to performing that duty with due care. *Id.* There being no such undertaking in the instant case, the Court finds plaintiffs' reliance on *Chachere* misplaced. *Cf. Ramirez,* 893 F.Supp. at 124 (holding that Postal Service's decision not to promulgate security regulations was protected under discretionary function exception, and that even if security measures had been undertaken the negligent implementation of those policies would still fall within the exception).

Having found that the guidelines governing the Postal Service allowed for an exercise of judgment in security decisions and that the decision to rely solely on local law enforcement was "susceptible to policy analysis," the Court holds that the discretionary function exception of the FTCA bars plaintiffs' negligence claim against the United States in this case. Accordingly, Counts I and II of the complaint must be dismissed.

### Olin and the Sports Authority's Motion to Dismiss

*Counts V–VII: Strict Products Liability*

The liability of a manufacturer and seller for injuries caused by a defectively designed product is governed by the New Jersey Products Liability Act (hereinafter the "NJPLA"), N.J. Stat. Ann. 2A:58C–1 et seq. (West 1987), *as amended by* Act of June 29, 1995 (West Supp.1997). The NJPLA provides in pertinent part:

**2A:58C–2 Liability of a manufacturer or seller; proof by preponderance of evidence product not reasonably fit, suitable or safe for its intended purpose** A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it . . . was designed in a defective manner.

. . . . .

**2A:58C–9 Identification of manufacturer; strict liability of product supplier**

. . . . .

d. A product seller shall be liable if—

. . . . .

(2) The product seller knew or should have known of the defect in the product which caused the injury, death or damage or the plaintiff can affirmatively demonstrate that the product seller was in possession of facts from which a reasonable person would conclude that the product seller had or should have had knowledge of the alleged defect in the product which caused the injury, death or damage. . . .

*Id.* §§ 2A:58C–2, 58C–9. Passed as part of New Jersey's tort reform effort, the NJPLA drastically changed the method of analyzing products liability cases and has been interpreted as evincing a legislative policy "to limit the expansion of products liability law" so as to "balance the interests of the public and the individual with a view towards economic reality.". *Dewey v. R.J. Reynolds Tobacco Co.,* 121 N.J. 69, 96, 577 A.2d 1239 (1990); *Zaza v. Marquess & Nell, Inc.,* 144 N.J. 34, 47–48, 675 A.2d 620 (1996) (quotations omitted) (recognizing that public policy and fairness considerations lie at the heart of New Jersey products liability law and are particularly germane in cases where the alleged misconduct of persons other than the manufacturer bears on the question of responsibility for the harm).

A prerequisite to recovery under any theory of strict products liability is proof of a defective condition. *Id.* at 49, 675 A.2d 620. While ordinarily the primary focus in a products liability analysis is the safety of the product, not the reasonableness of the manufacturer's conduct, in a design defect case the ultimate inquiry is whether the manufacturer acted in a reasonably prudent fashion in designing and fabricating the product. *Id.* at 50, 675 A.2d 620. Thus, to state a prima facie case of strict liability under a design-defect theory, a plaintiff must establish that the product is "not reasonably fit, suitable and safe for its intended purpose." N.J. Stat.Ann. 2A:58C–2. A plaintiff must show that: (1) the product was defective; (2) the defect existed when the product left the manufacturer's control; and (3) the defect caused injury to a reasonably foreseeable user or victim. *Zaza,* 144 N.J. at 49, 675 A.2d 620; *Jurado v. Western Gear Works,* 131 N.J. 375, 385, 619 A.2d 1312 (1993). Defectiveness may not be inferred from the fact that someone was injured. *Zaza,* 144 N.J. at 49, 675 A.2d 620. Rather, liability for a design defect may only be imposed where the manufacturer is responsible for the defective condition. *Id.* A manufacturer will be strictly liable for a design defect even where the defect is a contributing or concurrent, but not the sole, cause of harm. *Jurado,* 131 N.J. at 383, 619 A.2d 1312.

The NJPLA provides three absolute affirmative defenses to design-defect liability: (1) the state-of-the-art defense; (2) the obvious danger/consumer expectation defense; and (3) the unavoidably unsafe defense. N.J. Stat. Ann. 2A:58C–3 a.

**2A:58C–3 Defenses**

a. In any product liability action against a manufacturer or seller for harm allegedly caused by a product that was designed in a defective manner, the manufacturer or seller shall not be liable if:

(1) At the time the product left the control of the manufacturer, there was not a practical and technically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the product; or

(2) The characteristics of the product are known to the ordinary consumer or user, and the harm was caused by an unsafe aspect of the product that is an inherent characteristic of the product and that would be recognized by the ordinary person who uses or consumes the product with the ordinary knowledge common to the class of persons for whom the product is intended ... and is not intended to apply to dangers posed by products ... that can feasibly be eliminated without impairing the usefulness of the product; or

(3) The harm was caused by an unavoidably unsafe aspect of the product and the product was accompanied by an adequate warning or instruction. . . .

b. The provisions of paragraph (1) of subsection a. of this section shall not apply if the court, on the basis of clear and convincing evidence, makes all of the following determinations:

(1) The product is egregiously unsafe or ultrahazardous;

(2) The ordinary user or consumer of the product cannot reasonably be expected to have knowledge of the product's risks, or the product poses a risk of serious injury to persons other than the consumer or user; and

(3) The product has little or no usefulness.

*Id.* The net effect of these defenses is that a product which falls within any one of the statutory provisions (§ 3a(1), § 3a(2) or § 3a(3)) is, by definition, not defectively designed. *Roberts v. Rich Foods, Inc.,* 139 N.J. 365, 378, 654 A.2d 1365 (1995).

▆▆▆ The obvious danger/consumer expectation defense provides a complete defense to liability where the danger is an inherent aspect of the product and where the danger could not feasibly be eliminated without impairing the usefulness of the product. *Id.* at 379, 654 A.2d 1365 (quoting N.J. Stat. Ann. 2A:58C–3 a(2)). Dangers which are not inherent can be eliminated without impairing the product's usefulness, while conversely, inherent dangers cannot be eliminated without impairing the product's utility. *Id.* at 380, 654 A.2d 1365. Thus, a danger is inherent where it arises from some aspect of the product which is essential or indispensable to the product's intended use. *Id.* A feature which is desirable but not necessary is not an inherent characteristic. *Id.* Elimination of an inherent characteristic may not render the product totally useless, but will "measurably reduce the product's appropriateness for its intended function." *Id.* at 382, 654 A.2d 1365. Thus, to impair the usefulness of the product means to significantly diminish its intended use. *Id.* at 381–82, 654 A.2d 1365. Once a defendant proves that the danger is open and obvious and that the harm was inflicted by an inherent and known characteristic of the product, the plaintiff bears the burden of establishing the unavailability of the defense, and to do so must prove that the defendant could have eliminated the danger without eliminating an inherent characteristic of the product. *Id.* at 382, 654 A.2d 1365.

▆▆▆ The "unavoidably unsafe" defense recognizes that certain products are unavoidably dangerous because they are incapable of being made safe for their intended and ordinary use. *Shackil v. Lederle Labs.,* 116 N.J. 155, 181, 561 A.2d 511 (1989). The defense embodies the principle of comment k of the Restatement (Second) of Torts § 402A that while some products are unavoidably unsafe, they may be rendered safer by provision of adequate warnings. *See* Restatement (Second) Torts § 402A cmt. k. Thus, while ordi-

narily applied in the context or prescription drugs and medicines, the unavoidably unsafe defense provides that a manufacturer or seller is not liable where harm results from an unavoidably unsafe aspect of the product and the product is accompanied by a proper warning. *Id.*

New Jersey courts have not considered the imposition of strict liability upon a manufacturer for injuries inflicted by hollow-point ammunition. Other courts which have considered the issue have consistently held that manufacturers of hollow-point bullets cannot be held strictly liable for their design, manufacturing or sale under a design defect theory. *See, e.g., Perkins v. F.I.E. Corp.,* 762 F.2d 1250, 1274–75 (5th Cir.), *reh'g denied sub nom. Richman v. Charter Arms Corp.,* 768 F.2d 1350 (5th Cir.1985); *McCarthy v. Sturm, Ruger & Co.* ("McCarthy I"), 916 F.Supp. 366, 371 (S.D.N.Y.1996) (holding that plaintiffs failed to state a claim for design defect because expanding design of Black Talon bullets was functional element of inherently dangerous product), *aff'd sub nom. McCarthy v. Olin Corp.* ("McCarthy II"), 119 F.3d 148 (2d Cir.1997); *Forni v. Ferguson,* 232 A.D.2d 176, 648 N.Y.S.2d 73, 74 (1996) (holding that allegations were insufficient to state a claim for design defect against bullet manufacturer where sale of ammunition was legal and no showing of specific defect had been made); *Downs v. R.T.S. Security, Inc.,* 670 So.2d 434, 438–39 (La.Ct.App.), *reh'g denied* (Apr. 24, 1996). Those courts which have specifically considered the imposition of strict liability for the alleged defective design of Black Talon bullets have refused to impose liability for the allegedly increased dangers inflicted by the spiked Black Talon design, reasoning that Black Talon bullets, like all ammunition, are designed to cause injuries and are thus not unfit for their intended purpose. *See McCarthy II,* 119 F.3d at 155 (quoting *Forni,* 648 N.Y.S.2d at 74) (" 'As a matter of law, a product's defect is related to its condition, not its intrinsic function.' The bullets were not in defective condition nor were they unreasonably dangerous for their intended use because the Black Talons were purposely designed to expand on impact and cause severe wounding."); *Downs,* 670 So.2d at 438 ("[T]he 'Black Talon' ammunition func-tioned in a manner consistent with its basic purpose. There was no flaw in the ammunition in the functional sense. The function of a bullet is to inflict injury or death.... Unfortunately, it is reality that some products ... must, by their very nature, be dangerous to be functional. And while they have the potential to inflict injury or death, this alone does not necessarily give rise to liability.").

Plaintiffs here argue that "the Black Talon bullet should not have been marketed and sold to the general public" because the Black Talon bullet causes far more destruction than reasonably necessary and serves no purpose but to kill. Plaintiffs' Joint Brief in Opposition to Olin's Motion to Dismiss, at 6,7. Plaintiffs further argue that the characteristic that makes Black Talon bullets defective, i.e. their ability to tear flesh and organs, is not an inherent characteristic of the bullets. Further, plaintiffs contend that even if the maiming ability were an inherent characteristic, it is an unsafe aspect that would only be recognized by criminals, not the general consumer, and the increased harm caused by the jagged, razor-sharp formation could be eliminated without impairing the usefulness of the product. Thus, plaintiffs contend that Olin does not fall within the "obvious danger/consumer expectation" defense. Plaintiffs further argue that the harm caused by the increased danger of the Black Talon bullet in the hands of the general public is avoidable and thus Olin cannot assert the "unavoidably unsafe" defense.

■ In the absence of controlling authority, this Court will follow the reasoning employed by the New York and Louisiana courts. Though neither New York nor Louisiana law mirrors the NJPLA. the essence of a design defect claim under the laws of all three states is the same: there must be something wrong with the product that makes it unfit or unsuitable for its intended use. In the instant case, plaintiffs have failed to establish that Black Talon bullets are unsafe, unfit or unsuitable for their intended use within the meaning of the NJPLA, or to present sufficient facts to deprive Olin of the obvious danger/consumer expectation defense.

First, the Court rejects plaintiffs' contention that Black Talon bullets are not inherently dangerous within the meaning of the NJPLA. Plaintiffs assert that the sole use for, and in fact the hallmark of, Black Talon bullets is their capacity to maim or inflict serious bodily injury with their razor-sharp spikes. Plaintiffs argue, however, that the very flesh-tearing ability, which is the sole use for the bullets and which renders the bullets defective, is not an inherent characteristic and can be eliminated without impairing their usefulness. As plaintiffs concede, the intended use of Black Talon bullets is to maim or kill by tearing through flesh in a manner not comparable to other bullets. In the instant case, the bullets functioned precisely as intended. *See McCarthy II,* 119 F.3d at 155 ("The bullets were not in defective condition nor were they unreasonably dangerous for their intended use because the Black Talons were purposely designed to expand on impact and cause severe wounding."). The Court finds that the incomparable destructive capacity of the bullets is attributable to their unique talon-like design, which is essential to their intended use. *See Roberts,* 139 N.J. at 380, 654 A.2d 1365. While elimination of this design may not render Black Talons wholly useless as bullets, such alteration would, as Olin contends, measurably reduce the bullets' utility for their intended function by depriving them of that quality which makes them uniquely capable of incomparable destruction. Though the Court has grave doubts as to the social utility, if any, of products such as Black Talon bullets whose sole purpose is destruction of human life, the New Jersey Legislature has not prohibited the sale or manufacture of those bullets. In the absence of such legislative action, this Court declines to, in effect, judicially ban this product.

The Court also rejects plaintiffs' argument that the dangers of Black Talon bullets are unknown to the general public or the targeted consumer. Plaintiffs contend that Olin withdrew the bullets from sale to the general public in response to public outcry regarding their dangers. Plaintiffs argue, however, that the general public is unable to recognize the danger of increased harm caused by the Black Talon design. Given plaintiffs' assertions regarding the public outcry, Olin's advertising highlighting the bullets' characteristics, the press such ammunition has received and the plaintiffs' acknowledgment thereof, the Court finds that the dangers of Black Talon bullets would be recognized "by the ordinary person who uses or consumes the product with the ordinary knowledge common to the class of persons for whom the product is intended." N.J. Stat. Ann. 2A:58C–3 a(2). The Court therefore finds that the obvious danger/consumer expectation defense applies to remove Olin from the reach of the NJPLA, and that plaintiffs have failed to state a claim of strict products liability against Olin for the defective design of the Black Talon bullets. Accordingly, Count V of plaintiffs' complaint must be dismissed.

■ Count VI of the complaint must also be dismissed. In alleging that Black Talon bullets are egregiously unsafe and ultrahazardous, pose a risk of harm to persons other than the consumer, and have no usefulness, plaintiffs do not state any independently recognized cause of action under New Jersey law. Rather, they merely recite the factors necessary to deprive Olin of the state-of-the-art defense.[5] *See* N.J. Stat. Ann. 2A:58C–3 b. The Court declines to address the applicability of that defense given Olin's disavowal of reliance thereon. Further, having found that plaintiffs have failed to establish a design defect because Olin falls within the obvious danger/consumer expectation defense, the Court need not address the applicability of the unavoidably unsafe defense.

Having found that plaintiffs have failed to state a claim that the Black Talon bullets

---

**5.** The Court finds Olin's arguments as to Count VI misplaced. Olin argues that plaintiffs have failed to state allegations sufficient to support a claim of ultrahazardous activity. However, a careful reading of Count VI clarifies that plaintiffs do not allege that the manufacture and marketing of the Black Talon bullets are ultra-hazardous activities, but rather that the bullets themselves are ultrahazardous products. While New Jersey common law recognizes a cause of action for ultrahazardous activity, a claim not presented here, New Jersey law, as noted, does not recognize a distinct cause of action for ultra-hazardous products.

were defectively designed, the Court also holds that plaintiffs have failed to state a claim against the Sport Authority for selling the bullets to Green. *See* N.J. Stat. Ann. 2A:58C–2, 58C–9 (requiring proof of defect to impose liability on seller). Accordingly, Count VII of plaintiffs' complaint must also be dismissed.

*Counts VIII–X: Negligence*

The crux of plaintiffs' negligence theory is two-fold. First, plaintiffs argue that Olin negligently marketed Black Talon bullets for sale to the general public. Plaintiffs argue that Olin should have known that its advertising, which highlighted the ripping and tearing capacity of the bullets, would appeal to society's criminal element. Second, plaintiffs argue that Olin was negligent in its failure to ensure rapid removal of the bullets from the shelves of retailers following Olin's announcement on November 22, 1993 that it would withdraw Black Talon bullets from sale to the general public. Plaintiffs contend that in deciding to withdraw the bullets from the market, Olin voluntarily assumed a duty to act reasonably in carrying out the withdrawal. Plaintiffs contend that Olin breached that duty by failing to have the bullets off the shelf by November 24, 1993 when Green purchased the bullets used to kill plaintiffs' decedents. Plaintiffs further argue that if Olin had taken the appropriate steps to ensure that Black Talon bullets could not have been purchased by Green, the severity of the injuries to plaintiffs' decedents would have been lessened, or even avoided.

To state a cause of action for negligence under New Jersey law, plaintiffs must establish that: (1) Olin owed them a duty; (2) Olin breached that duty; (3) plaintiffs suffered injury which was proximately caused by the breach. *Endre v. Arnold,* 300 N.J.Super. 136, 142, 692 A.2d 97, 100 (App.Div.1997); *Anderson v. Sammy Redd & Assocs.,* 278 N.J.Super. 50, 56, 650 A.2d 376, 379 (App. Div.1994). The existence of a duty is a question of law to be decided by the Court. *Carvalho v. Toll Bros. & Developers,* 143 N.J. 565, 572, 675 A.2d 209 (1996); *Endre,* 300 N.J.Super. at 142, 692 A.2d at 100; *Anderson,* 278 N.J.Super. at 56, 650 A.2d at 379. Duty is a flexible concept which signi-

fies conformance to a standard of reasonable conduct in light of the apparent risk. *Theobald v. Dolcimascola,* 299 N.J.Super. 299, 303–05, 690 A.2d 1100, 1102–03 (App.Div. 1997). Foreseeability of harm is the predicate factor in deciding whether to impose a duty of care; however, the ability to foresee injury to a potential plaintiff does not alone confer a duty. *Carvalho,* 143 N.J. at 572, 573, 675 A.2d 209. Considerations of fairness and policy are also significant factors which require a careful balancing of: the relationship between the parties; the responsibility for conditions creating the risk of harm; the nature of the attendant risk; the opportunity and ability to exercise care; and the public interest in the imposition of a duty. *Id.* at 572–77, 675 A.2d 209 ("The element of control arising from the relationship between the parties and the opportunity and capacity of defendant to have avoided the risk of harm. . . .[and] actual awareness of knowledge of the risk of harm [are] also significant in determining the fairness in imposing a duty of care.").

New Jersey courts have not considered the imposition of a duty upon manufacturers of ammunition to refrain from marketing techniques which highlight the product's destructive characteristics or to prevent criminal misuse of their products. However, other courts which have considered the issue have held that manufacturers of handguns and bullets owe no duty to control the distribution of their products or to prevent their misuse by criminals. *See, e.g., McCarthy II,* 119 F.3d at 157 ("We also hold that Olin was under no legal duty to prevent criminal misuse of its product and therefore affirm the dismissal of the negligence claims."); *Resteiner v. Sturm, Ruger & Co.,* 223 Mich.App. 374, 566 N.W.2d 53, 54 (1997) (holding that plaintiffs could not state a claim for negligent marketing against gun manufacturer for injuries arising out of criminal misuse of stolen gun absent special relationship between manufacturer and victims); *Forni v. Ferguson,* 232 A.D.2d 176, 648 N.Y.S.2d 73, 74 (1996) (dismissing plaintiffs' negligence claim against manufacturer of handgun and ammunition, reasoning that manufacturer owed no duty to refrain from lawful distribution of a non-defective product); *King v. R.G. Indus.,*

*Inc.*, 182 Mich.App. 343, 451 N.W.2d 874, 876 (1990) (holding that plaintiff failed to state cognizable claim for negligence against manufacturer arising out of criminal misuse of "Saturday night specials" where plaintiff did not allege that handgun malfunctioned); *Delahanty v. Hinckley*, 564 A.2d 758, 762 (D.C. 1989) (holding that plaintiffs could not state negligence claim against gum manufacturer for injuries resulting from criminal misuse of gun in absence of special relationship between manufacturer and injured plaintiff or user and in absence of reasonable means for manufacturers to screen gun purchasers).

In *McCarthy I*, a case factually similar to the case at bar, the United States District Court for the Southern District of New York considered the propriety of imposing a duty on Olin to control the distribution of Black Talon bullets under a theory of negligent marketing. *See McCarthy I*, 916 F.Supp. at 369. The court noted that Olin's advertisements emphasize those qualities which distinguish Black Talon bullets from other ammunition on the market. *Id.* The Court noted that despite plaintiffs' contentions that Olin's advertisements attracted society's criminal element, plaintiffs had failed to allege that the advertisements were in any way false or misleading. *Id.* The court declined to find that Olin was negligent in its advertising, reasoning that to so hold would effectively hold Olin liable for manufacturing a product with distinguishing characteristics, which the court refused to do. *Id.* The court further rejected plaintiffs' negligence claim for lack of causation, noting that the criminal's conduct was "an extraordinary act which broke the chain of causation." *Id.* at 372.

In affirming the district court's dismissal of plaintiffs' negligent marketing claim, the Court of Appeals for the Second Circuit in *McCarthy II* reasoned that:

> although it may have been foreseeable by Olin that criminal misuse of the Black Talon bullets could occur, Olin is not legally liable for such misuse.... [A]ppellants have not alleged that any special relationship existed between Olin and [the criminal]. Here, Olin could not control the actions of [the criminal]. "[I]t is unreasonable to impose [a] duty where the realities of every day experience show us that, regardless of the measures taken, there is little expectation that the one made responsible could prevent the ... conduct [of another]."
>
> .... To impose a duty on ammunition manufacturers to protect against criminal misuse of its product would likely force ammunition products—which legislatures have not proscribed, and which concededly are not defectively designed or manufactured and have some socially valuable uses—off the market due to the threat of limitless liability. Because Olin did not owe a legal duty to plaintiffs to protect against [the criminal's] horrible action, appellants' complaint does not state a cause of action for negligence and the claim was properly dismissed.

*McCarthy II*, 119 F.3d at 157 (quotation omitted).

 In the instant case, the Court is persuaded by the reasoning in the *McCarthy* cases and accordingly finds that both of plaintiffs' negligence claims against Olin must fail. Plaintiffs have failed to allege sufficient facts to warrant imposition of a duty on Olin to refrain from advertising the distinguishable characteristics of legally sold Black Talon bullets, or to ensure against their criminal misuse. Plaintiffs have similarly failed to allege sufficient facts to establish that Olin assumed a duty to ensure that the Black Talon bullets which it intended to recall from the market would be removed from store shelves and unavailable for purchase two days following Olin's announcement.

Plaintiffs do not allege that Olin's advertising was false or misleading, or that the sale of Black Talon bullets was illegal. *See* N.J. Stat. Ann. 2C:39–1 et seq. (West 1992) (governing firearms and other weapons). Plaintiffs also do not allege, nor does the Court find, that any special relationship existed between Olin and Green such that Olin could control or prevent Green's conduct. The absence of any such relationship, even where Green's misconduct was arguably foreseeable, militates against imposing on Olin a duty to refrain from advertising the distinguishing characteristics of its ammunition.

Plaintiffs have provided no evidence that Olin was responsible for creating the risk of harm to the victims, or that Olin had either the opportunity or ability to control that risk such that imposition of a duty would be reasonable under the instant circumstances. In asking this Court to hold Olin negligent for advertising the destructive capabilities of the Black Talons, plaintiffs effectively seek to require Olin to prevent the criminal misuse of its product. Such a ruling would expose Olin to limitless liability and make Olin an insurer against criminal activity. This Court declines to impose such a duty. Having failed to establish a duty, plaintiffs cannot state a cognizable claim for negligence. Accordingly, Count VIII of the complaint alleging negligent marketing must be dismissed.

For the same reasons, the Court similarly declines to impose on Olin a duty to recall its legally distributed Black Talon bullets from the shelves of retailers before Green purchased them. Not only have plaintiffs failed to allege sufficient facts to support imposition of a duty by this Court, but plaintiffs have also failed to establish that Olin voluntarily assumed such a duty. Plaintiffs' contention that Olin's press release of November 22, 1993 evidences plaintiffs' assumption of a duty to recall is without merit. Plaintiffs have cited no authority, and the Court's research has yielded none, which requires manufacturers of legally distributed ammunition to ensure instantaneous removal of their products from the shelves upon an announced intention to discontinue product sales to a certain market and to refocus their marketing efforts. Having failed to establish a duty, plaintiffs cannot state a cognizable claim for negligence. Accordingly, the Count IX of the complaint alleging negligent recall must also be dismissed.

■ The Court further finds that plaintiffs have failed to state a cognizable claim against the Sports Authority for negligent sale of the bullets to Green. Plaintiffs argue that once it was aware that Black Talon bullets were to be pulled off the shelf, the Sports Authority had a duty to act prudently to ensure that the product was no longer sold to its customers. Plaintiffs have failed to allege facts showing that the Sports Authority was ever directed to remove the bullets from the shelves or that it was responsible for creating the risk of harm to plaintiffs' decedents. Plaintiffs have also failed to allege that the Sports Authority had either the opportunity or ability to control that risk such that imposition of a duty would be reasonable under the instant circumstances. Plaintiffs have cited no authority, and the Court's research has yielded none, which imposes on retailers a duty to prevent the legal sale of ammunition following a manufacturer's announced intention to withdraw the ammunition from sale to the general public. Further, having found that Olin owed no duty to ensure prompt recall of the bullets, the Court declines to impose the equivalent duty on the Sports Authority. Having failed to establish a duty, plaintiffs cannot state a cognizable claim for negligence. Accordingly, the Count X of the complaint alleging negligent sale must also be dismissed. Having found that plaintiffs have failed to state any cognizable products liability or negligence claim against either Olin or the Sports Authority, the Court holds that Count XI of the complaint seeking damages for the defendants' alleged torts must also be dismissed.

### ORDER

For the reasons set forth in the accompanying Opinion, **IT IS** on this 2nd day of December 1997 **ORDERED** that the United States' motion to dismiss Counts I and II of the complaint is granted.

**IT IS FURTHER ORDERED THAT** the motion by Olin and the Sports Authority to dismiss Counts V–XI of the complaint is granted.