Jan BROWN, Administratrix Ad Prose-
quendam of the ESTATE OF Stuart
Brown, and Jan Brown, individually,
Plaintiff,

v.

PHILIP MORRIS INC., Lorillard To-
bacco Co., and Brown & Williamson
Tobacco Corp., et al., Defendants.

No. CIV.A.99–4139.

United States District Court,
D. New Jersey.

June 27, 2002.

Edward Slaughter, Jr., Pellettieri, Rabstein & Altman, Princeton, NJ, for Plaintiffs.

Christopher J. Michie, Ezra D. Rosenberg, Dechert, Princeton, NJ, for Defendant Philip Morris Inc.

Charles Michael Lizza, William S. Tucker, Jr., LeBoeuf, Lamb, Greene & Macrae, Newark, NJ, for Defendant Lorillard Tobacco Co.

William C. Slattery, Slattery & Jepperson, P.C., Short Hills, NJ, for Defendant Brown & Williamson Tobacco Corp.

## MEMORANDUM OPINION

COOPER, District Judge.

Plaintiff Jan Brown has filed suit against three tobacco companies for the alleged smoking-related death of her husband, Stuart Brown. Presently before the Court are the following motions for summary judgment of defendant tobacco companies: (1) Brown & Williamson Tobacco Corporation ("Brown & Williamson") separately moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56") on the ground that the record is devoid of proof that plaintiff's decedent smoked any cigarette manufactured or sold by Brown & Williamson; (2) Philip Morris Incorporated ("Philip Morris"), Lorillard Tobacco Company ("Lorillard"), and Brown & Williamson (collectively the "defendants") jointly move for summary judgment pursuant to Rule 56 on state law grounds and on federal preemption grounds. For the reasons stated in this Memorandum and Order, the Court will grant Brown & Williamson's motion for summary judgment and will grant defendants' motion for summary judgment on state law grounds.

### BACKGROUND

Stuart Brown was diagnosed with cancer at the base of his tongue in 1998. (Defs.' Statement of Material Facts in Supp. of Their Mot. for Summ. J. ("Defs. Material Facts") ¶ 4; Pl.'s Response to Defs.' Statement of Undisputed Material Facts and Pl.'s Counter Statement of Facts Made Pursuant to Local Civil Rule 56.1 ("Pl. Material Facts") ¶ 4.) Stuart Brown had been a smoker of cigarettes for many years. On June 10, 1999, Stuart Brown gave a videotaped statement at his attorney's office, and that videotape was later transcribed. (Certif. of Sherri L. Warfel, Esq., dated 12–28–02, Ex. 23: Portions of Tr. of Videotaped Statement of Stuart Brown taken on 6–10–99 ("Brown Tr.").)

Stuart Brown and Jan Brown, his wife, commenced this action by Complaint filed in New Jersey Superior Court on July 20, 1999. (Compl.) The matter was removed to this Court. Stuart Brown ("decedent") died on February 10, 2000. (Defs. Material Facts ¶ 4; Pl. Material Facts ¶ 4; see

*generally* Am. Compl.) Plaintiff Jan Brown then filed an Amended Complaint on July 19, 2000, in which plaintiff asserted claims against three cigarette manufacturers, Brown & Williamson, Philip Morris, and Lorillard, for injuries decedent allegedly sustained, including wrongful death. (*See generally* Am. Compl.) In the First and Second Counts of the Amended Complaint, plaintiff asserts claims for common-law strict liability and negligence, and a claim under the New Jersey Products Liability Act.[1] (Am. Compl. First & Second Counts.) In the Second Count, plaintiff also alleges fraudulent concealment. (*Id.* Second Count.) In that Count, plaintiff specifically alleges:

> The defendants did design, manufacture, fabricate, assemble, sell and distribute said cigarettes with knowledge that cigarettes, when used in the manner intended by the defendants, contain or produce substances which are addictive and did intend that users thereof, to include the plaintiff as a member of the general public to whom said cigarettes were offered for sale, should develop an addiction or dependence to or on cigarettes or the substances contained therein and produced thereby, such that users thereof would continue to use the said products. This the defendants did with knowledge or with reason to know that cigarettes are carcinogenic in appropriate individuals. Accordingly, the said action or omission was done in wilful disregard to the health consequences to users of the said product, to include the plaintiff.

(*Id.* Second Count ¶ 2.) Plaintiff alleges intentional and fraudulent misrepresentation in the Fourth Count: "The defen-

dants, individually and jointly, did intentionally and fraudulently misrepresent the quality and characteristics of the products with the intent of inducing members of the public, to include the plaintiff, to purchase the products, with knowledge that said products did not have the qualities and characteristics set forth by the defendants." (*Id.* Fourth Count ¶ 2.)[2] Claiming conspiracy in the Fifth Count, plaintiff alleges: "The defendants knew of should have known of the deleterious health effects of the said products. Notwithstanding the foregoing the defendants did conspire amongst themselves or with others, to hide, misrepresent, and/or distort facts known to them, and did, nevertheless, continue to induce members of the general public, to include the plaintiff, to purchase and use said products." (*Id.* Fifth Count ¶ 2.) The remaining Counts, Sixth and Seventh, are claims for damages rather than separate causes of action.

Discovery is complete, and the Court heard oral argument on defendants' summary judgment motions on February 4, 2002.

## DISCUSSION

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial bur-

---

1. There is a degree of ambiguity within the Amended Complaint's framing of plaintiff's causes of action. The Court thus draws clarification from the parties' understanding of those causes action as reflected in their briefs, oral argument, and discovery.

2. Plaintiff voluntarily dismissed her claim for breach of express warranty in the Third Count of the Amended Complaint.

den of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met that initial burden, the non-moving party must present evidence that establishes that a genuine issue of material fact exists, making it necessary to resolve the difference at trial. *Id.* at 324, 106 S.Ct. 2548; *Jersey Cent. Power & Light Co. v. Lacey Township,* 772 F.2d 1103, 1109 (3d Cir.1985). A non-moving party, rather than rely on mere allegations, must present actual evidence that creates a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The role of the judge at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48, 106 S.Ct. 2505. Material facts are only those facts that might affect the outcome of the action under governing law. *Id.* at 248, 106 S.Ct. 2505; *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir.1991). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## II. *Motion of Brown & Williamson for Summary Judgment*

Brown & Williamson moves for summary judgment on the ground that plaintiff cannot prove that Brown & Williamson caused the alleged injuries because there is no competent, admissible evidence in the record that decedent smoked any cigarette sold or made by Brown & Williamson. (Mem. of Def. Brown & Williamson Tobacco Corp. in Supp. of Its Mot. for Summ. J. ("BW Br.") at 8–14.) In plain terms, Brown & Williamson argues that plaintiff "cannot claim harm from a product that the admissible evidence shows [decedent] did not use." (*Id.* at 8.) In her Amended Complaint, plaintiff alleges that decedent smoked Parliament, Marlboro, Marlboro Light, Newport, and Kool cigarettes. (Am.Compl.) The parties agree that of those five cigarette brands, only Kool is made by Brown & Williamson. (Brown & Williamson's Local Civil Rule 56.1 Statement ¶ 3; Pl.'s Resp. to Def. Brown & Williamson Tobacco Corp.'s Statement of Facts and Pl.'s Counter–Statement of Facts Made Pursuant to Local Civil R. 56.1 ¶ 3.) At issue between the parties is whether competent, admissible evidence exists in the record to show that decedent smoked the Kool brand of cigarettes.

In opposition to summary judgment, plaintiff points to deposition testimony of the following persons: (1) Paul Walker, a former co-worker of decedent; (2) Steven Mack, a friend of decedent; (3) Lois Maleman, mother of decedent; and (4) Robin Roseland, sister of decedent (Pl.'s Br. in Opp'n to Def. Brown & Williamson Tobacco Corp.'s Mot. for Summ. J. ("Pl. Br. in Opp'n to BW") at 2, 4–6.) Plaintiff also suggests that the videotaped statement that decedent gave at his attorney's office on June 10, 1999, should be considered as evidence that decedent smoked Kool ciga-

rettes.[3] (*Id.* at 1, 5, 10–11.) Plaintiff argues that the deposition testimony together with decedent's videotaped statement provide sufficient evidence of a genuine issue regarding whether decedent smoked Brown & Williamson's product, Kool cigarettes. We shall consider first the admissibility of that videotaped statement.

### A. *Admissibility of Videotaped Statement of Stuart Brown*

■ Plaintiff maintains that decedent's videotaped statement would be admissible at trial under the Federal Rules of Evidence and should be considered in opposition to Brown & Williamson's summary judgment motion. (*Id.* at 11.) In reply, Brown & Williamson contends that decedent's statement is inadmissible hearsay that should not be used to oppose summary judgment. (Reply Mem. of Def. Brown & Williamson Tobacco Corp. in Further Supp. of Its Mot. for Summ. J. ("BW Reply Br.") at 5–11.) Apparently acknowledging that the videotaped statement constitutes hearsay, plaintiff argues that it would be admissible under Federal Rule of Evidence 807 ("Rule 807").[4] (Pl. Br. in Opp'n to BW at 11; Pl.'s Sur Reply Br. to Def. Reply Br. ("Pl. Sur Reply to BW") at 2–5.) The Court considers next whether the videotaped statement comes within the scope of Rule 807

■ Rule 807, the "residual" or "catch—all" exception the hearsay rule, provides:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 807. Under the language of Rule 807, therefore, the purported evidence must meet five requirements: trustworthiness, materiality, probative importance, interests of justice, and notice. *See Coyle v. Kristjan Palusalu Mar. Co.*, 83 F.Supp.2d 535, 545 (E.D.Pa.2000), *aff'd*, 254 F.3d 1077 (3d Cir.2001). In viewing those requirements, a court must be cognizant that Congress intended that Rule 807 "be used very rarely, and only in exceptional circumstances." *Id.; see also United States v. Bailey*, 581 F.2d 341, 347 (3d Cir.1978) (stating that residual hearsay exception is "to be used only rarely, and in exceptional circumstances" and is meant to "apply only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present"). As a district court has stated, "[a] catch-all rule such as Rule 807 must be sparingly invoked, lest its poten-

---

3. The transcript of decedent's videotaped statement reflects the following comment of decedent concerning Kool cigarettes: "I smoked Kools for a while." (Brown Tr. at 20.)

4. In her opening brief, plaintiff argues that decedent's videotaped statement "would be admissible under *F.R.E.* 803(3), 804(b)(2) and 807." (Pl. Br. in Opp'n to BW at 11.) That single invocation of Federal Rules of Evidence 803(3), the "state of mind" hearsay

exception, and 804(b)(2), the "dying declaration" hearsay exception, is the full extent of plaintiff's argument regarding those exceptions. In her sur-reply, plaintiff discusses only the applicability of Federal Rule of Evidence 807, with no further reference to Rule 803(3) and 804(b)(2). (*See generally* Pl. Sur Reply to BW.) Given that plaintiff finds Rules 803(3) and 804(b)(2) unworthy of discussion, the Court likewise will address only the applicability of Rule 807.

tial breadth swallow the carefully crafted narrowness of the enumerated exceptions." *Russo v. Abington Mem. Hosp. Healthcare Plan,* No. Civ. A. 94–195, 1998 WL 967568, at *3 (E.D.Pa. Nov.18, 1998). With regard to that residual hearsay exception, the Third Circuit has "required some degree of rigor attendant to its invocation." *Trs. of Univ. of Pa. v. Lexington Ins. Co.,* 815 F.2d 890, 906 (3d Cir.1987).

■ The most important requirement of Rule 807 is that the hearsay evidence have "circumstantial guarantees of trustworthiness," and courts consider the following factors in evaluating the trustworthiness of hearsay evidence: whether the declarant was under oath; the voluntariness of the statement; whether the statement was based on personal knowledge; whether the statement contradicted any previous statement; whether the statement was preserved on videotape to provide the jury an opportunity to evaluate the declarant's demeanor; the declarant's availability for cross-examination; the statement's proximity in time to the events described; whether the statement is corroborated; the declarant's motivation to fabricate; whether the statement was prepared in anticipation of litigation; the statement's spontaneity; and whether the declarant's memory or perception was faulty. *Sternhagen v. Dow Co.,* 108 F.Supp.2d 1113, 1119 (D.Mont.1999).

The present case bears resemblance to the circumstances found in *Sternhagen v. Dow Co.,* 108 F.Supp.2d 1113 (D.Mont. 1999), in which the federal court was called on to decide the admissibility under the residual hearsay exception of an *ex parte* videotaped statement of a decedent. In *Sternhagen,* to which the parties in this case make reference, the decedent sued the manufacturers of an herbicide to which he allegedly had been exposed as a teenager. *Id.* at 1114–15. Shortly before he filed his complaint and without notice to the defendants, the decedent gave a sworn, videotaped statement upon questioning by his attorney. *Id.* at 1115. In that statement, he purportedly identified herbicides that the defendants manufactured. *Id.* Four months after commencing the action and before his deposition could be taken, the decedent died. *Id.* at 1115–16. Certain defendants moved for summary judgment on the basis of inadequate product identification. *Id.* at 1116. In opposition, the plaintiff proffered the decedent's videotaped statement. *Id.* The court deemed the statement inadmissible under Rule 807. *Id.* at 1120–21.

In this case, as in *Sternhagen,* decedent made the statement voluntarily and based its contents on his personal knowledge. *Id.* at 1119. Also, it appears that nothing in the statement contradicted any previous statement that decedent made, and the statement was preserved on videotape. *See id.*

Although consideration of those factors weighs in favor of application of the residual exception to the hearsay rule, we determine that other factors so significantly diminish the statement's trustworthiness that the statement cannot be admitted into evidence under that exception. Decedent, unlike the decedent in *Sternhagen,* did not make the statement under oath and penalty of perjury. *See id.* at 1120. That lack of oath in this case makes decedent's videotaped statement an even weaker candidate for admission than the videotaped statement considered in *Sternhagen.* As in *Sternhagen,* defendants here did not have the opportunity to cross-examine decedent, and the statement was not spontaneous. *Id.* As in *Sternhagen,* the statement here was made many years after the events giving rise to plaintiff's claims, and decedent had an interest in presenting facts related to his statement in the light most favorable to his claims. *See id.* Ad-

ditionally, although decedent's statement was videotaped in the month prior to the filing of the Complaint, it appears that the statement was prepared in anticipation of litigation, which further weighs against its trustworthiness. *See id.*

■ In sum, the Court's balancing of the various indicia of trustworthiness leads to the conclusion that decedent's videotaped statement lacks circumstantial guarantees of trustworthiness equivalent to those of the other exceptions to the hearsay rule.[5] The residual exception must be "sparingly invoked," *Russo*, 1998 WL 967568, at *3, and only in "exceptional circumstances," *Bailey*, 581 F.2d at 347, which are not present here. Therefore, the videotaped statement is inadmissible and cannot create a genuine issue of material fact for summary judgment.

### B. *Deposition Testimony*

■ Plaintiff contends that ample proof exists that decedent smoked *Kool* cigarettes, relying on the deposition testimony of Paul Walker ("Walker"), Steven Mack ("Mack"), Lois Maleman ("Maleman"), and Robin Roseland ("Roseland"). (Pl. Br. in Opp'n to BW at 4–9.) Brown & Williamson argues that the deposition testimony amounts to nothing more than unfounded speculation concerning decedent's use of a Brown & Williamson product. (BW Br. at 11–14; BW Reply Br. at 2–5.) The Court, therefore, will examine the challenged deposition testimony to determine its probative value on the issue of decedent's use of Kool cigarettes.

Walker, a former roommate and business associate of decedent, met decedent in 1993 or 1994 (Certif. of Thomas R. Smith, Esq., dated 12–21–01 ("Smith Certif."), Ex. B: Dep. of Paul Walker dated 8–9–00 ("Walker Dep.") at 15–16, 26). Plain-

tiff points predominantly to the following deposition testimony as evidence that decedent smoked Kools (*see* Pl. Br. in Opp'n to BW at 4–6):

Q. Okay. Do you know during the couple of years that [decedent] smoked after you knew him, do you know what brand or brands he smoked during that time period?

A. I'll take a guess. I think he smoked Kools, a menthol cigarette.

Q. Is that—

A. But I'm not sure.

Q. Okay. What is it that makes you think it was Kools? I—you say you're not sure but why do you think it was Kools?

A. I think maybe I saw that pack that—the colors of that pack, the green and white, but it could have been Marlboro, too. I don't really know the answer. I'm just saying I think possibly it may have been Kool but I don't remember.

(Walker Dep. at 113–14).

Plaintiff relies on the following deposition testimony of Mack (Pl. Br. in Opp'n to BW at 4–6):

Q. Do you recall what brand of cigarettes [decedent] was smoking when he lived with you in the apartment?

A. I know that he smoked a menthol cigarette and I think that—he may have changed. He tried different brands. I don't know specifically which ones but at one time he was smoking a menthol brand.

Q. Okay.

A. Maybe Kool. I—something menthol.

(Smith Certif., Ex. C: Dep. of Steve Mack dated 11–14–00 ("Mack Dep.") at 63.)

---

**5.** Because of the statement's questionable trustworthiness, the Court need not address the other elements for application of the Rule 807 exception. *See Sternhagen*, 108 F.Supp.2d at 1121 n. 10.

Walker's testimony is speculation. At most, Walker merely could "guess" that decedent "possibly" smoked Kools, and even then emphasized that he (Walker) was "not sure" and ultimately "[did]n't remember" the cigarette brand that decedent smoked. Similarly, in his testimony, Mack acknowledged that he had no specific knowledge of the brands that decedent smoked, speculating that the menthol brand decedent smoked was "maybe" Kool. Such speculation does not permit an inference that decedent smoked Kool cigarettes. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 383 n. 12 (3d Cir.1990) (stating that "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment").

 Plaintiff also looks to the deposition testimony of Lois Maleman, decedent's mother, and Robin Roseland, decedent's sister. According to plaintiff, Maleman "saw her son smoke a menthol cigarette, although she was not sure of the brand." (Pl. Br. in Opp'n to BW at 6) (citing Maleman Dep. at 100.) Maleman's cited testimony is not probative on any product identification issue because she identifies no product at all.[6] With regard to Roseland's testimony, plaintiff points out that Roseland testified that decedent took cigarettes from her when they were teenagers. (Pl. Br. in Opp'n to BW at 6.) Plaintiff also notes that

Roseland further testified that she smoked Marlboro, but also smoked Kools for a period. (*Id.*) Plaintiff suggests that "[a] logical inference, in light of the other testimony is [decedent] took Kool cigarettes from his sister when she was smoking that brand." (*Id.*) The testimony from Roseland on which plaintiff relies, however, does not permit such an inference. (*See id.*) (citing Roseland Dep. at 44, 64.) Roseland actually testified that when decedent took cigarettes from her, she was smoking Marlboro. (*See* Roseland Dep. at 44.)[7] Roseland, therefore, expressly confined her brand identification concerning borrowed cigarettes to Marlboro.[8]

Nothing in the proffered testimony proves or supports any reasonable inference that decedent smoked Kool cigarettes. Plaintiff, at best, has provided speculative testimony that neither proves nor provides the basis for any inference that decedent consumed that brand of cigarette. Speculation is insufficient to raise genuine issues of material fact concerning whether decedent smoked Kool cigarettes. *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 252 (3d Cir.1999) (stating that speculation and conclusory allegations are insufficient to forestall summary judgment); *Sterling Nat'l Mortgage Co. v. Mortgage Corner, Inc.*, 97 F.3d 39, 44 (3d Cir.1996) (stating that "[m]ere speculation about the possibility of the existence of such facts"

6. Maleman's complete testimony on the issue is as follows:

Q. Did you ever see [decedent] smoke any cigarette other than Marlboro Lights?
A. Yeah. There was a time when he was trying to quit smoking and he went.to menthol.
Q. Do you know what brand of menthol?
A. No.
Q. Do you know what the box looked like?
A. No.
(Smith Certif., Ex. E: Dep. of Lois Maleman dated 8–23–00 at 100.)

7. Roseland testified:

Q. How about you and Stuart; did you share cigarettes?
A. No. He took mine.
Q. What were you smoking at the time?
A. Marlboro.
(Roseland Dep. at 44.)

8. Roseland's only invocation of the Kool brand is her statement that she smoked Kools for a short period when she was 14 or 15 years old. (Roseland Dep. at 64.)

does not raise triable issue to defeat motion for summary judgment); *Dunkin' Donuts Inc. v. Patel*, 174 F.Supp.2d 202, 212 (D.N.J.2001) ("Genuine issues of material fact cannot be raised by speculation and conclusory allegations."); *Sebro Packaging Corp. v. Liberty Mut. Fire Ins. Co.*, 69 F.Supp.2d 642, 643 (D.N.J.1999) ("Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact.").

▮▮▮ Plaintiff, therefore, cannot prove that Kool cigarettes were a causative factor in producing decedent's alleged injuries. A fundamental principle of products liability law is that "a plaintiff must prove, as an essential element of his case, that the defendant manufacturer actually made the particular product which caused the injury." *Namm v. Charles E. Frosst & Co.*, 178 N.J.Super. 19, 27, 427 A.2d 1121, 1125 (App.Div.1981) (internal quotation marks omitted). Proof of causation is a requisite element for establishing any product-liability action in New Jersey. *Coffman v. Keene Corp.*, 133 N.J. 581, 594, 628 A.2d 710, 716 (1993). A recent decision in a tobacco case from another jurisdiction supports the dismissal of claims against Brown & Williamson here. In dismissing all claims (including negligence, strict liability, fraud, and conspiracy) brought by a smoker's administratrix against Philip Morris Incorporated, the district court in *Magnus v. Fortune Brands, Inc.*, 41 F.Supp.2d 217 (E.D.N.Y. 1999), held: "Since [the decedent] never smoked Philip Morris products, there can be no causal link between [the decedent's] injuries and defendant's actions, and all of [the plaintiff's] claims against Philip Morris must be dismissed." *Id.* at 227. In this case, as in *Magnus*, plaintiff cannot establish the necessary element of causation because she has provided insufficient evidence that decedent was exposed to a Brown & Williamson's product. According-

ly, Brown & Williamson is entitled to summary judgment.

### III. *Motion for Summary Judgment on State Law Grounds*

Defendants move for summary judgment on the state law ground that the New Jersey Product Liability Act ("PLA"), N.J.S.A. § 2A:58C-1 to -11, subsumes plaintiff's other causes of action of common-law strict liability, negligence, fraudulent concealment, fraudulent misrepresentation, and conspiracy. (Mem. of Defs. in Supp. of Mot. for Summ. J. on State Law at 10–15 ("Defs.Br.") at 10–15.) With regard to plaintiff's common-law claims for fraud, defendants alternatively move for summary judgment on the state law ground that the record contains no evidence that decedent relied on any statement or omission by defendants. (Defs. Br. at 29–32.) The Court shall address each of those grounds in turn.

#### A. *PLA: Subsumption*

▮▮▮ The Court first addresses whether the PLA subsumes plaintiff's common-law causes of action for strict liability, negligence, fraud, and conspiracy. The PLA applies to every product liability action filed on or after the date of its enactment, July 22, 1987. *Tirrell v. Navistar Int'l, Inc.*, 248 N.J.Super. 390, 398, 591 A.2d 643, 647 (App.Div.), *certif. denied*, 126 N.J. 390, 599 A.2d 166 (1991). A "product liability action" is "*any* claim or action brought by a claimant for harm caused by a product, *irrespective of the theory underlying the claim*, except actions for harm caused by breach of an express warranty." N.J.S.A. § 2A:58C-1b(3) (emphasis added). The PLA "established the sole method to prosecute a product liability action[,]" and after its enactment, "only a single product liability action remains." *Tirrell*, 248 N.J.Super. at 398–99, 591 A.2d

at 647–48. The Third Circuit has held that the PLA "effectively creates an exclusive statutory cause of action for claims falling within its purview." *Repola v. Morbark Indus., Inc.,* 934 F.2d 483, 492 (3d Cir. 1991). That Court also predicted that "the New Jersey Supreme Court would hold that the NJPLA generally subsumes common law product liability claims, thus establishing itself as the sole basis of relief under New Jersey law available to consumers injured by a defective product." *Id.*

Because the PLA generally subsumes common-law product liability claims, *see id.,* the Third Circuit, the New Jersey District Court, and New Jersey State courts consistently have dismissed product liability claims based on common-law theories when those theories allege "harm caused by a product." *See, e.g., Port Auth. of N.Y. & N.J. v. Arcadian Corp.,* 189 F.3d 305, 313 (3d Cir.1999) (dismissing negligence claim, stating that "[u]nder New Jersey law negligence is no longer viable as a separate claim for harm caused by a product"); *Repola,* 934 F.2d at 489–94 (dismissing claims of negligence and negligent failure to warn); *Thomas v. Ford Motor Co.,* 70 F.Supp.2d 521, 528–29 (D.N.J.1999) (dismissing common-law claim for negligent manufacture); *Reiff v. Convergent Techs.,* 957 F.Supp. 573, 583 (D.N.J.1997) (dismissing negligence and breach of warranty claims); *McWilliams v. Yamaha Motor Corp. USA,* 780 F.Supp. 251, 262 (D.N.J.1991) (dismissing claims of negligence and breach of implied warranty), *aff'd in part, rev'd in part on other grounds,* 987 F.2d 200 (3d Cir.1993); *Tirrell,* 248 N.J.Super. at 399, 591 A.2d at 647–48 (dismissing negligence claim); *see also, e.g., Green v. Gen. Motors Corp.,* 310 N.J.Super. 507, 517, 709 A.2d 205, 209 (App.Div.1998) (stating that "causes of action for negligence, strict liability and implied warranty have been consolidated into a single product liability cause of action"

under the PLA); *Ramos v. Silent Hoist & Crane Co.,* 256 N.J.Super. 467, 473, 607 A.2d 667, 670 (App.Div.1992) (stating that "Legislature has consolidated the negligence, breach of warranty and strict liability theories for product liability claims" into single product liability action under PLA).

In light of the PLA and that uniform decisional law interpreting that statutory provision, the Court determines that the PLA clearly subsumes plaintiff's common-law claims for strict liability and negligence. Whether the PLA subsumes plaintiff's fraud claims is a closer question, however. Plaintiff's brief in opposition is largely unresponsive to defendants' argument and legal discussion that the PLA subsumes plaintiff's common-law causes of action, and therefore plaintiff provides negligible assistance to the Court in deciding the issue of subsumption. (*See generally* Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. Based on State Law ("Pl. State Law Br.").) In her brief, plaintiff's only attempt at response to defendants' extensive discussion of how the PLA subsumes the common-law claims is to invoke *Cipollone v. Liggett Group,* 505 U.S. 504, 530, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), a decision that plaintiff contends "specifically provides that claims based on express warranty, intentional fraud and misrepresentation, and conspiracy are yet available." (Pl. State Law Br. at 3.) At oral argument, plaintiff again relied merely on *Cipollone* in arguing against subsumption. (Tr. of Oral Argument held on 2–4–02 ("Tr.") at 45.). Contrary to plaintiff's implication, *Cipollone* is silent on the distinct state law issue of whether the PLA subsumes plaintiff's common-law causes of action. The United States Supreme Court in *Cipollone* dealt with the issue of federal preemption, and the Court prefaced its analysis by stating that it expressed "no opinion on whether these actions are viable claims as a matter of state law; we assume, *arguendo,* that they are." *Id.* at 524, 112 S.Ct.

2608. Contrary to plaintiff's sole contention, therefore, *Cipollone* speaks not at all to the issue of whether the PLA subsumes plaintiff's commonlaw causes of action. Plaintiff thus leaves an argument vacuum on her side of the subsumption issue.

Defendants fill that vacuum by referring the Court to two decisions from the District of New Jersey that not only support the proposition that the PLA subsumes plaintiff's strict liability and negligence claims, but also support the proposition that her fraud claims are subsumed as well: *Walus v. Pfizer, Inc.*, 812 F.Supp. 41, 45 (D.N.J.1993), and *Midili v. Phillip Morris, Inc.*, Civ. A. No. 99–3900 (D.N.J. June 29, 2000). In *Walus*, the plaintiff asserted theories of negligence, strict liability, failure to warn, fraud, misrepresentation, and negligent and intentional infliction of emotional distress. 812 F.Supp. at 42. After analyzing the PLA and cases interpreting it, the Court granted summary judgment to the defendants. *Id.* at 45. With regard to the fraud claim specifically, the Court concluded that the PLA subsumed that claim also, noting that "New Jersey treats all product liability actions the same, regardless of the theory asserted. Plaintiffs cannot ... recast[ ] their product liability claims as fraud claims." *Id.* (citation omitted).

Relying on *Walus*, the Court in *Midili* examined a claim against the defendants involving the accusation that the defendants engaged in "fraud in the marketing and advertising of [Marlboro] cigarettes for having concealed information about their addictive and carcinogenic qualities and for having manipulated the nicotine levels of these cigarettes while failing to disclose that such manipulation occurred." *Midili*, No. 99–3900, slip op. at 2. Rejecting the plaintiff's fraud claim as frivolous, the Court reasoned: "At its core, [the plaintiff's] claim for fraud against [the defendant] concerns physical injuries allegedly suffered as· a result of the use of [ ] cigarettes. An 'intricate analysis of state law' is not required to discern that this claim is a product liability claim 'recast' as a common-law fraud claim." *Id.* at 8–9.[9]

■ Any doubt that plaintiff's common-law causes of action, including her fraud causes of action, involve "harm caused by a product" under the PLA is removed when plaintiff straightforwardly states that her "claim is indeed based on the assertion that [decedent] contracted fatal cancer from smoking cigarettes." (Pl. State Law Br. at 4.) Therefore, in light of that frank statement, the dearth of argument and authority supplied by plaintiff, and the persuasive authority supplied by defendants, the Court concludes that the PLA subsumes plaintiff's common-law causes of action, including those for fraud and conspiracy to commit fraud.[10]

---

**9.** At least one commentator appears to agree that the PLA subsumes fraud claims:

> It seems likely that fraud and negligent misrepresentation claims have been subsumed by the PLA. The PLA, by its terms, governs *all* claims for harm caused by a product (except claims for breach of express warranty) *"irrespective of the theory underlying the claim."* It therefore subsumes intentional torts involving harm caused by a product, as well as common law torts of negligence, breach of warranty, and strict liability.

Epstein et al., New Jersey Product Liability Law, § 3.09 (Butterworth 1994).

**10.** Even if not subsumed, plaintiff's claims for fraud and conspiracy fail for other reasons. Plaintiff claims for fraudulent misrepresentation and concealment fail because plaintiff cannot establish the element of reliance. *See infra* part III.B. Absent her fraud claim or other intentional tort, plaintiff's conspiracy claim fails for lack of an underlying tort. Civil conspiracy is not an independent cause of action, and conspiracy liability depends on the presence of an underlying finding of tort liability. *See, e.g., Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 497 (D.N.J.1998) (stating that "a conspiracy is not actionable absent an independent wrong"). The dis-

### B. Common–Law Fraud: Reliance Element

 Assuming *arguendo* that the PLA does not subsume plaintiff's fraud-based claims, defendants move for summary judgment on the alternative state law ground that plaintiff's common-law fraud claims fail because the record contains no evidence that decedent relied on any statement or omission of defendants. (Def. Br. at 29–32.) Specifically, defendants maintain that plaintiff's claims for fraudulent misrepresentation, fraudulent concealment, and conspiracy based on fraud (Counts Two, Four, and Five) fail because plaintiff has produced no evidence that decedent personally saw or heard any allegedly false statement or omission from defendants. (*Id.*)

The New Jersey Supreme Court's decision in *Kaufman v. i–Stat Corp.*, 165 N.J. 94, 754 A.2d 1188 (2000), is dispositive on this issue. In that decision, the Supreme Court held that the fraud-on-the-market theory fails to satisfy the reliance element of common-law fraud and that a purchaser of corporate securities could not maintain a claim for negligent misrepresentation based on a fraud-on-the-market theory. *Id.* at 109–18, 754 A.2d at 1195–1200. In *Kaufman*, the plaintiff provided no evidence that she had read the allegedly fraudulent statements of the defendants on which she later based her fraud and negligent misrepresentation claims. *Id.* at 100, 754 A.2d at 1190–91. Rejecting the plaintiff's contention that proof of individual reliance was unnecessary for her common-law fraud claim, the New Jersey Supreme Court stated: "The actual receipt and consideration of any misstatement remain central to the case of any plaintiff seeking to prove that he or she was deceived by the misstatement or omission. The element of reliance is the same for fraud and negligent misrepresentation." *Id.* at 109, 754 A.2d at 1195.

Interpreting *Kaufman,* the Court in *Morgan v. Markerdowne Corp.,* 201 F.R.D. 341, 347 (D.N.J.2001), addressed circumstances in which the plaintiff, a student loan borrower, sought to bring a class action against her school and the school's owners, alleging that the defendants' inducements for her to incur loans amounted to common-law fraud and a violation of the New Jersey Consumer Fraud Act. Because the plaintiff failed to demonstrate that the class members relied on any statements of the defendants, the Court denied class certification under the plaintiff's theory of a unified fraud scheme. *Id.* Viewing the Supreme Court's decision in *Kaufman* as controlling, the Court in *Morgan* stated that the New Jersey Supreme Court in *Kaufman* "rehearsed the well-established rule of New Jersey law that actual receipt and consideration of any alleged misrepresentation—reliance—is central to a common law fraud claim." *Id.* In language particularly relevant for the present matter, the Court in *Morgan* emphasized:

> If the Supreme Court of New Jersey has flatly refused to expand New Jersey's common law of fraud to adopt the fraud-on-the-market theory in its quintessential context—*Kaufman* was a securities-fraud case brought under New Jersey law—surely it would refuse to countenance an analogous theory sought to be imported into New Jersey's common law of fraud in a case brought outside that context.

*Id.*

Plaintiff acknowledges that reliance is an essential element of any fraud claim

---

missal of plaintiff's other causes of action demands the dismissal of her conspiracy claim. *See, e.g., id.; Tynan v. Gen. Motors Corp.,* 248 N.J.Super. 654, 668–69, 591 A.2d 1024, 1032 (App.Div.1991), *rev'd in part on other grounds,* 127 N.J. 269, 604 A.2d 99 (1992).

(Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. Based on Fed. Law ("Pl. Federal Br.") at 5), and she concedes that she has no evidence that decedent ever heard any statement of defendants.[11] Instead, plaintiff lists various public and nonpublic statements of defendants and other tobacco companies and asks the Court to allow an inference that decedent relied on those statements to his detriment. Plaintiff argues: "The defendants have engaged in decades of a pattern of intentional fraud and misrepresentation wherein [decedent] entered into countless transactions with them to purchase their products from the youthful age of approximately ten to eleven years old. A jury may infer reliance upon those misrepresentations because [decedent] purchased the brands of cigarettes manufactured by the defendants and smoked those cigarettes for approximately thirty years." (Pl. Federal Br. at 21 (citation omitted).) By plaintiff's own account, then, she offers a fraud-on-the-market theory of reliance as the foundation for her fraud claims. As is clear from the decisions in *Kaufman* and *Morgan,* however, New Jersey law unequivocally rejects such a theory.[12]

Plaintiff also suggests that New Jersey allows proof of indirect reliance to satisfy the reliance element of a common-law fraud claim. (Pl. Federal Br. at 6.) That is an accurate statement of New Jersey law, and the Supreme Court's *Kaufman* decision left undisturbed the traditional principles of indirect reliance. *Kaufman,* 165 N.J. at 111, 754 A.2d at 1196 (stating that "[i]ndirect reliance remains today what we held it to be in *Judson* and *Rosenblum* "). Even indirect reliance, however, requires that the plaintiff "actually hears the substance of the misrepresentation, by means however attenuated, and considers the actual content of that misrepresentation when making the decision to complete the transaction[.]" *Id.,* 754 A.2d at 1197. Plaintiff here has failed to provide any proof of even indirect reliance.[13] In *Kaufman,* the Supreme Court rejected the plaintiff's assertion of indirect reliance because she, as with plaintiff here, had "failed to establish that she relied, however indirectly, on the misstatements of I Stat and its management. Therefore, under our traditional standard for proof of reliance, even indirect reliance,

---

**11.** In her deposition testimony, plaintiff acknowledges that a lack of proof that decedent heard statements from defendants:

Q: Do you know whether [decedent] ever heard a statement by a tobacco company that smoking was good for your health?
A: No.
Q: Do you know if he ever heard any statement from a tobacco company concerning smoking in general?
A: I don't know if he did or did not.
(Brown Dep. at 412). None of decedent's family members or close friends testified that he saw, read, or heard, let alone relied on, any statement or advertisement of defendants.

**12.** Plaintiff never acknowledges the Supreme Court's definitive decision in *Kaufman.* Instead, in support of her fraud-on-the-market theory, plaintiff erroneously cites the New Jersey Appellate Division's decision in *Kauf-*

*man v. I–Stat Corp.,* 324 N.J.Super. 344, 735 A.2d 606 (App.Div.1999), which, of course, was reversed by the New Jersey Supreme Court in *Kaufman.*

**13.** At oral argument, plaintiff stated that the only proof that she "can adduce that the cigarette industry communicated with [decedent] directly as a person was through its program whereby it would send advertisements to his home indicating to him that if he smoked a certain number of cigarettes and sent him a certain number of empty packs it would give him a discount on certain products, such as clothing and things of that sort." (Tr. at 45.) Plaintiff acknowledges that "[t]his is not a context where there is direct communication" (*id.* at 46), and that any direct communication from the cigarette companies to decedent was "only with respect to a sales program" and "not with respect to the nature of their product." (*Id.* at 45.)

plaintiff fails to show reliance and, therefore, fails to make out a claim for fraud." *Id.* at 111, 754 A.2d at 1197. That reasoning applies with equal force in this case, as plaintiff has failed to establish that decedent relied, directly or indirectly, on any statement of defendants.[14] Other courts have dismissed fraud-based claims when the plaintiff provides insufficient proof of reliance. *See, e.g., Allgood v. R.J. Reynolds Tobacco Co.*, 80 F.3d 168, 171 (5th Cir.1996) (granting summary judgment to defendants on plaintiff's fraud claim because evidence showed only that deceased smoker had read publications containing cigarettes ads, as opposed to having relied on ads); *Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F.Supp.2d 70, 83 (N.D.N.Y. 2000) (granting summary judgment to defendant on intentional misrepresentation and fraud claims when plaintiff failed to establish that decedent relied on any advertising or promotional statements); *Insolia v. Philip Morris Inc.*, 53 F.Supp.2d 1032, 1044–45 (W.D.Wis.1999) (granting summary judgment to defendants on fraud-based claims because "[a]s a matter of logic, plaintiffs cannot argue they relied on statements that they never heard"). Assuming that the PLA does not subsume

plaintiff's fraud claims, those claims nevertheless fail for lack of proof of reliance.

### C. *PLA: Design–Defect Claim*

█ Although the PLA subsumes the common-law causes of action, plaintiff's PLA design-defect claim remains.[15] Defendants argue that plaintiff's PLA claim fail for two reasons. First, plaintiff fails to establish a prima facie case for design-defect because she concedes that she can provide no alternative feasible design as required by the PLA. (Defs. Br. at 16–17.) Second, plaintiff's design-defect claim is barred because the allegedly unsafe aspects of cigarettes were obvious dangers at the time decedent was smoking. (*Id.* at 18–26.) The Court addresses first defendants' argument that plaintiff fails to provide an alternative feasible design.

Under the PLA, a defendant is not liable for a design defect if "there was not a practical and technologically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the product." N.J.S.A. § 2A:58C–3(a)(1); *see also Smith v. Keller Ladder Co.*, 275 N.J.Super. 280, 284, 645

---

**14.** Plaintiff primarily depends on *Varacallo v. Massachusetts Mutual Life Insurance Co.*, 332 N.J.Super. 31, 752 A.2d 807 (App.Div.2000), in support of her reliance argument. Such dependence is ill-founded. First, *Varacallo* was decided before the Supreme Court's definitive opinion in *Kaufman.* The Appellate Division actually relies on and discusses the reversed decision of the Appellate Division in *Kaufman*, and that reliance calls into question the foundation of the *Varacallo* opinion. *Varacallo*, 332 N.J.Super. at 47–48, 752 A.2d at 816. Second, the *Varacallo* court confronted a situation unlike the circumstances of the present case. There, the court addressed the following narrow question: "For purposes of certifying a class, must the plaintiffs offer direct proof that the entire class relied on defendant's representation that omitted material facts, where the plaintiffs have established

that the defendant withheld these material facts for the purpose of inducing the very action the plaintiffs' pursued?" *Id.* at 49, 752 A.2d at 817. And in *Varacallo,* as in *Michaels Building Co. v. Ameritrust Co., N.A.,* 848 F.2d 674 (6th Cir.1988), another decision plaintiff discusses, the court allowed an inference that the plaintiff relied on material misstatements of the defendants because the plaintiffs has established that they had read those misstatements and took action as a result. *Varacallo*, 332 N.J.Super. at 41, 752 A.2d at 812; *Michaels*, 848 F.2d at 679 n. 8. But there is no such evidence in this case.

**15.** Plaintiff states that she is not advancing a failure-to-warn claim. (Pl. Federal Br. at 3.) Plaintiff, therefore, is only alleging liability under the PLA on the basis of a design-defect claim.

A.2d 1269, 1271 (App.Div.1994) (stating that to establish prima facie case of design defect, plaintiff must demonstrate availability of technologically feasible and practical alternative design that would have reduced or prevented plaintiff's harm). Plaintiff sets forth no alternative design and concedes that there is no such design.[16] Plaintiff, instead, suggests that the Court should allow her design-defect claim to go to a jury on the theory that cigarettes are ultrahazardous under subsection 3b of the PLA ("subsection 3b").

The PLA provides no independent basis for liability based on ultrahazardous products. *See Leslie v. United States*, 986 F.Supp. 900, 910 n. 5 (D.N.J.1997) (stating that although New Jersey common law recognizes cause of action for ultrahazardous activity, New Jersey law does not recognize distinct cause of action for ultrahazardous products). The PLA provides three absolute affirmative defenses to design defect liability: (1) the state-of-the-art defense; (2) the obvious danger/consumer expectation defense; and (3) the unavoidably unsafe defense. N.J.S.A. § 2A:58C–3a. A product that falls within one of those statutory defenses is, by definition, not defectively designed. *Roberts v. Rich Foods, Inc.*, 139 N.J. 365, 378, 654 A.2d 1365, 1371–72 (1995).

The PLA provides for the negation of a defendant's state-of-the-art defense if each of the three elements of subsection 3b are satisfied. "In attempting to limit a manufacturer's liability, the Legislature, via the [PLA], strengthened rather than weakened the state-of-the-art defense." *Id.* at 375, 654 A.2d at 1370. The provisions of the state-of-the-art defense

shall not apply if the court, on the basis of clear and convincing evidence, makes all of the following determinations:

(1) The product is egregiously unsafe or ultrahazardous;

(2) The ordinary user or consumer of the product cannot reasonably be expected to have knowledge of the product's risks, or the product poses a risk of serious injury to persons other than the consumer; and

(3) The product has little or no usefulness.

N.J.S.A. § 2A:58C–3b. The subsection 3b exception, therefore, "applies to certain egregiously unsafe or ultrahazardous products that have hidden risks or could seriously injure third person, and have little or no usefulness." *Roberts*, 139 N.J. at 375, 654 A.2d at 1370. It is that provision upon which plaintiff stakes her PLA claim.[17]

**16.** At oral argument, plaintiff acknowledged that cigarettes cannot be made safer. (Tr. at 39.) Also, plaintiff's discovery responses indicate the failure of proof of alternative design:
9. Do you contend that Defendants could have done anything in connection with the manufacture or design of the cigarettes that [decedent] allegedly smoked which would have permitted him to smoke said cigarettes without any risk of developing cancer?
RESPONSE: No.
12. Do you contend that Defendants could have done anything in connection with the manufacture or design of cigarettes that [decedent] allegedly smoked which would

have permitted [decedent] to smoke said cigarettes without becoming "addicted"?
RESPONSE: No.
(Certif. of Tara Kelly, Esq., dated 11–27–01, Ex. K: Plaintiff's Answers to Lorillard's First and Second Set of Interrogatories and Requests for Production, Nos. 9 & 12.)

**17.** Under the PLA, the determination whether a product meets the three requirements of subjection 3b is a question for the court, not the jury. N.J.S.A. § 2A:58C–3b (stating that state-of-art defense does not apply "if the court, on the basis of clear and convincing evidence, makes all of the following determinations").

A court's finding that subsection 3b applies is reserved for "genuinely extraordinary cases[.]" *Id.* (quoting Senate Judiciary Committee Statement). Asserting that she has negated defendants' state-of-the-art defense, plaintiff argues that she has satisfied those elements of subsection 3b "to make the defendants liable in this matter." (Pl. State Law Br. at 5.) According to plaintiff, she is alleging "that cigarettes are egregiously unsafe and ultrahazardous when used as intended by their manufacturers who intend them to be consumed in quantity for as long as the user can use them or is unable to quit." (*Id.* at 7.) In three sentences of her brief, plaintiff seeks to support that contention that she has met the requirements of subsection 3(b)(1) by (1) pointing to an expert's deposition testimony that purports to show that cigarette use is perhaps the single greatest cause of premature death and severe illness in the United States and the world (*id.* (citing Certif. of Sherri L. Warfel, Esq., Ex. 24: Videotape Dep. of Kenneth Michael Cummings, Ph.D., M.P.H., dated 7–2–01 ("Cummings Dep.") at 274)),[18] and (2) stating that defendants implicitly concede that cigarettes are ultrahazardous when defendants argue that the health risks of smoking are well known (*id.*). Neither ground supports plaintiff's position that cigarettes are ultrahazardous within the meaning of the PLA, and plaintiff has provided no statutory or decisional law that supports such a position.

Plaintiff would have the Court impose categorical liability on the cigarette manufacturers here, a position that the State Legislature effectively has rejected. In enacting the obvious danger/consumer expectation standard as part of the PLA, the Legislature rejected categorical liability for "familiar consumer products," which have use that "necessarily involves some risk of harm":

> This provision, which adopts the rule established by comment i to section 402A of the American Law Institute's Restatement (Second) of Torts, recognizes that there are many common products, such as food and other consumer products, whose use necessarily involves some risk of harm. This rule is intended to apply to familiar consumer products of the kind identified in comment i to section 402A of the Restatement (Second) of Torts.

Senate Judiciary Committee Statement, Senate No. 2805, L.1987, c. 197. The "familiar consumer products" in comment i to which the Legislature referred includes tobacco. Restatement (Second) of Torts, comment i (1965) ("Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous.") That the Legislature in the PLA specifically endorses the notion that "tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful" dictates the conclusion that the Legislature possesses no intent to impose categorical liability on cigarette manufacturers. Plaintiff contends that the statement that "tobacco is not unreasonably dangerous" merely "reflects the lack of true under-

---

**18.** Specifically, plaintiff cites lines 17 to 20 of page 274 of the expert's deposition testimony (Pl. State Law Br. at 7), which is fully as follows:

> As we know, one out of four smokers will die prematurely from their smoking and the number of people who suffer, you know, serious disease is much higher even than the number who die from smoking.

(Cummings Dep. at 274.)

standing of tobacco that existed in [the 1960s][,]" when comment i was written. (Pl. State Law Br. at 13.) That may or may not be accurate, but what is clear nonetheless is that the PLA still "adopts the rule established by comment i" of the Restatement (Second) of Torts, and courts interpreting New Jersey law must apply the comment's criteria in determining whether cigarettes are defectively designed. The upshot is that the PLA "precludes future design-defect claims by tobacco victims." Recent Development, "Tort Law—Strict Product Liability—New Jersey Supreme Court Preserves Claims Against Tobacco Companies—*Dewey v. R.J. Reynolds Tobacco Co.*, 121 N.J. 69, 577 A.2d 1239 (1990)," 104 Harv. L.Rev. 1723, 1730 n. 22 (1991).

Plaintiff would have this Court impose categorical liability through interpretation of the PLA, but plaintiff has provided the Court no authority upon which to base such a novel conclusion. *Cf. Leslie,* 986 F.Supp. at 910 ("[T]he New Jersey Legislature has not prohibited the sale or manufacture of [Black Talon] bullets. In the absence of such legislative action, this Court declines to, in effect, judicially ban this product."); *see also Gunsalus v. Celotex Corp.,* 674 F.Supp. 1149, 1159 (E.D.Pa. 1987) ("Whether products should be banned or whether absolute liability should be imposed for their use are determinations more appropriately made by the legislative branch of government.")

Plaintiff's reliance on *Dewey v. R.J. Reynolds Tobacco Co.,* 121 N.J. 69, 577 A.2d 1239 (1990), to support her argument that comment i is inapplicable, is counterproductive. *Dewey* actually buttresses defendants' argument. The common law governed the outcome in *Dewey* because the PLA was not effective at the time the *Dewey* lawsuit was filed. The defendants in *Dewey* argued that the Legislature's adoption in the PLA of comment i represented a mere codification of New Jersey common law and thus should be applied retroactively. *Id.* at 100, 577 A.2d 1239. Rejecting that argument, the Supreme Court of New Jersey refused to apply retroactively the PLA and its adoption of comment i; the Court recognized that retroactive application would have "eliminate[d] plaintiff's design-defect claim." *Id.* at 100, 577 A.2d 1239. This case, in contrast, *is* governed by the PLA. The clear implication of *Dewey's* holding for a similar case, such as the instant matter, governed by the PLA is that the PLA and its comment i "eliminate[s] plaintiff's design-defect claim." *Dewey,* therefore, fails to undergird plaintiff's argument, and actually supports defendants' position on the PLA.

Plaintiff fails to establish that cigarettes are "ultrahazardous" within the meaning of subsection 3b(1).[19] In light of that, defendants' state-of-the-art defense remains intact.[20] Plaintiff cannot establish her design-defect claim, and defendants are enti-

---

**19.** Because plaintiff does not meet the first element of "ultrahazardous" under subjection 3b, the Court need not consider whether plaintiff can prove the second and third elements—whether the dangers of cigarettes were unknown as required under subsection 3b(2) or whether cigarettes have little or no usefulness under subsection 3b(3).

**20.** Even if plaintiff could show that cigarettes satisfy subsection 3b, that section only would eliminate defendants' state of the art defense. The other absolute defenses—obvious danger and unavoidably unsafe—would remain available. Defendants argue that those defenses are applicable as well (Defs. Br. at 18–28), but the Court need not consider those arguments in light of the conclusion that summary judgment is appropriate on a prior basis.

tled to summary judgment on the PLA claim.

## CONCLUSION

The Court concludes that defendant companies in this case are entitled to summary judgment pursuant to Rule 56. The record reveals an absence of admissible, competent proof that decedent smoked a Brown & Williamson product, and plaintiff thus cannot prove that decedent's alleged injuries are causally connected to his use of Kool cigarettes. Further, plaintiff's claims cannot succeed on state-law grounds. The PLA subsumes her common-law causes of action. Even without subsumption of her fraud and conspiracy claims, those claims would fail for lack of evidence of reliance and for lack of an independent intentional tort, respectively. Finally, plaintiff does not provide sufficient evidence to support her design-defect claim under the PLA. Therefore, the Court must grant summary judgment to Philip Morris, Lorillard, and Brown & Williamson on state-law grounds and must dismiss plaintiff's Amended Complaint in its entirety. Given that disposition, the Court need not address defendants' argument that dismissal is appropriate also on federal preemption grounds.